## J. E. STAGG v. SPRAY WATER POWER AND LAND COMPANY.

### (Filed 31 May, 1916.)

**1. Corporations—Dividends—Guaranty.**

An indorsement on a certificate of preferred stock in a corporation guaranteeing the payment of the stated dividend in whole or in part, should be fairly and reasonably interpreted to effectuate the intention of the parties with regard to their objects and purposes as gathered from its language.

**2. Same—Interpretation—Bona Fides.**

A guaranty, written on shares of preferred stock in a corporation, that the indorser binds himself to pay any deficiency in the stated dividend, upon certain notice to him, will not be construed as a guaranty only of the fidelity of the officers of the corporation to pay the dividends upon the stock, if earned by it, or that they will be paid, whether earned or not, but as a guaranty that he will pay the dividends or any part thereof to the extent that the company may have failed to earn, declare, and pay them. ·

**3. Same—Corporate Existence.**

Where one has indorsed on a certificate of preferred stock in a corporation his obligation to pay the holder any deficiency of payment by the company of the stated dividends, arising from the failure of the corporation to pay, the intention of the parties, nothing else appearing, will be construed as contemplating the continued existence of the corporation as a going concern as the basis of their agreement of guarantee; and the holder may not recover the dividends which the corporation has failed to pay by reason of its having become insolvent and adjudged a bankrupt by the proper court.

**4. Same—Corporate Suspension.**

A guaranty that a corporation will pay the preferred dividends on its stock will not be construed to be without value because of the interpretation that the guaranty will cease should the corporation thereafter become insolvent and its existence as a going concern be legally suspended or terminated.

**5. Same—Bankruptcy.**

While the adjudication in bankruptcy is not necessarily the legal termination of a corporation, the effect of the adjudication is to suspend it, for the time being, at least, as a going concern; and where one has guaranteed the payment, in whole or in part, of such dividends as it may fail to pay, evidencing the intention that the guaranty was for such period as the company could lawfully pay them, no recovery therefor can be had during this period of suspension in an action brought since the adjudication and before the discharge of the corporation in bankruptcy.

**6. Same—Statutes—Constitutional Law.**

Legislative charters are under our Constitution, Art. VIII, sec. 1, subject to legislative alteration or repeal; and by our statute, Revisal, sec. 1196, a dissolution under a judgment of a court, as therein prescribed, is

valid, among other things, if the corporation become insolvent or suspends its ordinary business for the want of funds, or be in danger of insolvency, or has forfeited its charter rights. The retrospective provisions of Laws 1913, as to their validity, discussed by WALKER, J.

**7. Corporation—Dividends—Corporation Guarantor—Life of Corporation.**

The principle that preferred dividends guaranteed by indorsement on the certificates of stock in a corporation may be construed as upon condition that the corporation remains a going concern is not affected by the fact that the guarantor is a corporation and has agreed that it should be binding during its own life; for the period indicated is only the extreme duration of the guaranty, or that in which it may be enforced, if the condition contemplated continues that long. As to whether the guaranty in this case was *ultra vires*, or otherwise invalid, *quære*.

CLARK, C. J., and BROWN, J., dissenting.

APPEAL by defendant from *Justice, J.,* at June Term, 1915, of · ROCKINGHAM.

This action was brought to recover $1,080, alleged to be due under guaranties of the defendant indorsed upon three certificates each for twenty shares of the cumulative preferred stock which was issued by The American Warehouse Company, the par value of each share being $100. The certificate is in the following form:

THE AMERICAN WAREHOUSE COMPANY.

*Authorized Capital, $1,000,000.*

This certifies that J. E. Stagg is the registered owner of twenty cumulative preferred shares, of the par value of $100 each, in the capital of The American Warehouse Company, transferable only on the books of the corporation in person or by attorney on surrender of this certificate. The corporation will pay to the registered holder of this certificate a dividend of 6 per cent on the third Wednesday of July in each year before any dividend shall or can be paid or declared on the comon stock; and in addition thereto, in any year in which the company shall earn and pay a dividend of 6 per cent on the common stock the balance of dividends paid shall be distributed equally among the holders of preferred and common stock, and the holder thereof shall be entitled to his share of such extra dividend. If in any year the entire dividend on the preferred stock shall not be paid, the amount remaining unpaid shall be and remain a charge against the earnings of future years until all such arrears have been paid; and until such payment in full no dividend can or shall be paid on the common stock.

Executed at Spray, N. C., 5 January, 1905.

THE AMERICAN WAREHOUSE COMPANY,

*By* F. L. FULLER, *President.*

Countersigned:

· F. M. ELLETT, JR., *Secretary.*

*Shares, $100 each.*

STAGG v. LAND CO.

The indorsement therein is as follows:

[*Copy—Back of Certificate No. 124.*]

In each and every consecutive year from and after this date, should the dividends or any part thereof called for upon the face of the within certificate not be paid on its due date, for value received Spray Water Power and Land Company guarantees and binds itself to pay in cash ten days after notice of such default, to the holder of the within certificate, any such deficiency in the dividend as may arise from the failure of The American Warehouse Company to pay its annual dividend as stated in said certificate. This agreement is binding during the life of Spray Water Power and Land Company. It is understood and agreed that any certificate or certificates issued in lieu of this certificate upon the proper surrender and cancellation of this certificate is to have the same guaranty as that certificate so canceled.

Witness the seal of the company and the signature of its president and secretary, this 5 January, 1905.

SPRAY WATER POWER AND LAND COMPANY,
*By* B. FRANK MEBANE, *President.*

W. R. WALKER, *Secretary.*

(Corporate seal.)

The case was heard on a demurrer to the following complaint:

The plaintiff, complaining of the defendant, alleges:

1. That the defendant Spray Water Power and Land Company is now, and has been since 14 February, 1891, at which time it was duly incorporated by an act of the General Assembly of North Carolina for a period of ninety-nine years, a corporation with its principal place of business at Spray, North Carolina; the principal business of said corporation being to develop and sell its lands and water power to corporations which B. F. Mebane and W. R. Walker promoted or could induce to locate at Spray, North Carolina; and that The American Warehouse Company was incorporated under the laws of North Carolina in the year 1899.

2. That by the terms of its charter said corporation was, among other things, authorized as follows:

"SECTION 3. The said company shall have the power to make advances of money and of credit to other parties and to aid in like manner manufacturers and others; to indorse and guarantee the payment of bonds and the performance of the obligations of other companies, corporations, and-parties, and to assume, become responsible for, execute and carry out any contracts, leases, or subleases made by the company to or with any other company or companies, individuals, or firms whatsoever."

3. Upon information and belief, it is alleged that B. F. Mebane was the founder and promoter of the community of Spray and its textile industries and factories, and as a part of his plan to make that community a large manufacturing center, he conceived the idea of acquiring or controlling sites for such establishments and for the houses usually appertaining thereto, as well as the means of supplying power to said establishments; and further, as a protection to said factories and establishments, to acquire the control of a large part of the valuable and desirable lands in and around Spray; and to carry out his plan and purpose aforesaid, he incorporated or caused to be incorporated, or, after incorporation and organization, acquired the stock of the defendant Spray Water Power Company, or a majority thereof, in which movement he associated with him his wife and his business associate and close personal friend, W. R. Walker, said corporation being the source and means of carrying out the plans and ideas that the said Mebane had with respect to Spray and its industries, he electing to put into execution his ideas and plans through the medium of this corporation rather than individually or otherwise; the other two stockholders becoming such at his special instance and request, and for no other purpose than to comply with the law requiring three stockholders, it being well understood by those stockholders that the said Mebane was the dominant and controlling spirit of the movement and of the defendant corporation, said stockholders being acquainted with his purpose and plans and acquiescing therein.

4. That the said Spray Water Power and Land Company is now and was in 1905, and prior thereto, and has been at all times between those dates, the owner of large and valuable tracts of land situated in and around Spray, North Carolina, and a valuable water power on Smith River, which flows through said lands, or a portion thereof, the aforesaid land being so situated with respect to Spray and its textile industries as to afford the owner thereof the opportunity and means of exercising a dominant if not controlling influence upon any and all industries that were or may be established at Spray.

5. Upon information and belief, it is alleged that among other industries promoted and organized as aforesaid were the Nantucket Mills Company and The American Warehouse Company, the lands upon which the last named company erected its plant being purchased from the defendant.

6. That prior to 5 January, 1905, the plaintiff was the owner of shares of stock in one or more of the corporations promoted and organized by said B. F. Mebane, and carrying on business in the town of Spray in said Rockingham County, which said corporations were owned or controlled by the defendant Spray Water Power and Land Company, being at said time the owner of sixty shares of said stock of

the par value of $100 per share; that some of the stockholders of Nantucket Mills Company, one of the corporations promoted and organized by the said B. F. Mebane, and the majority of the stock of which was controlled either directly or indirectly by the defendant herein, including the plaintiff herein, became dissatisfied with their holdings in said company and were threatening litigation with respect thereto; whereupon the said Mebane, desiring to avoid such litigation, proposed to this plaintiff an exchange of stock, and as a result of negotiations following this proposal the said Mebane caused The American Warehouse Company to issue and deliver to the plaintiff sixty shares of the 6 per cent cumulative preferred stock in said The American Warehouse Company, said stock being in the form of three certificates for twenty shares each, said certificates being Nos. 123, 124, and 125, in exchange for the stock which he owned in other corporations at Spray, North Carolina, and caused the defendant Spray Water Power and Land Company, by an indorsement on the certificates of The American Warehouse Company issued as aforesaid, to agree to pay to the holder of said certificates a dividend of 6 per cent on the third Wednesday of July in each year, in case the regular annual dividend on the preferred stock of The American Warehouse Company was not paid by that company. Copies of said certificates Nos. 123, 124, and 125, issued to said plaintiff as aforesaid, together with the indorsement thereon, are hereto annexed as exhibits, which are asked to be taken as a part of this paragraph as fully as herein set out.

7. That he is informed and believes, and, therefore, alleges that said exchange of stock and said indorsement appearing on the certificates of stock of said The American Warehouse Company were made with the acquiescence and consent of all the stockholders of said defendant.

8. That he is informed and believes, and, therefore, alleges that said defendant Spray Water Power and Land Company was organized by the said B. F. Mebane, and that the stock was and is still owned or controlled by him, and that said defendant in turn, both before and since 5 January, 1905, owned a controlling amount of the capital stock of said The American Warehouse Company, which said warehouse company in turn, either by ownership of stock by contract or otherwise, controlled and dictated the business and acts of all the other textile corporations doing business in the town of Spray in said Rockingham County, and all of which were promoted, organized, and exploited by the said B. F. Mebane, who was president of said defendant as aforesaid; that said The American Warehouse Company by its charter had power, among other things, to manufacture textile products and to conduct a general warehouse business, to develop real estate and water power, to deal in goods, wares, and merchandise, and choses in action, and was also empowered to own and hold stock in

other corporations; that by contract with the other textile corporations located and doing business at Spray, promoted and organized by said B. F. Mebane as aforesaid, said The American Warehouse Company did the warehousing and finishing of the products of said other companies, the result being that said Spray Water Power and Land Company, by virtue of its ownership or control of a majority of the stock of said The American Warehouse Company, controlled and dominated said company, and all the other corporations hereinbefore referred to, and they were operated and their business conducted in a way beneficial to said defendant, and that whatever was for the benefit of any of said corporations resulted in benefit to said defendant.

9. That as an inducement and consideration for plaintiff to effect the exchange of stock as aforesaid, the defendant executed and indorsed, for the reasons and under the circumstances herein set out, upon said certificates the indorsement that appears on the copies of said certificates hereto attached, and in acquiring said stock of said The American Warehouse Company the plaintiff relied upon said indorsement of said defendant, and but for such indorsement would not have consented to said exchange.

10. That .B. F. Mebane and W. R. Walker were stockholders, as this plaintiff is informed and believes, in The American Warehouse Company during the year 1905, and both prior and subsequent thereto, and were active in organizing and promoting said company and were interested pecuniarily both in The American Warehouse Company and in Spray Water Power and Land Company, the last named company being at the time of the exchange of the stock as aforesaid, as this plaintiff is informed and believes, the owner of a large portion of the stock of The American Warehouse Company, which constituted at least a majority thereof.

11. From 5 January, 1905, up to but not including the dividend due on the third Wednesday in July, 1911, The American Warehouse Company paid to this plaintiff the dividends called for by the said certificates of its stock hereinbefore referred to, but defaulted in the payment of the dividend due thereon on the third Wednesday in July, 1911, which dividend, however, was paid to the plaintiff by one Malcolm R. Harris, who took from the plaintiff an assignment of said dividend claim, and who, as the plaintiff is informed and believes and, therefore, alleges, paid to him said dividend with money furnished by the said B. F. Mebane, and said dividend claim so assigned to the said Malcolm R. Harris was by him assigned to the said B. F. Mebane.

12. That said The American Warehouse Company failed, neglected, and refused to pay to the plaintiff the dividends due on said sixty shares of its stock held by him, and due and payable on the third Wednesday

in July of the years 1912, 1913, and 1914, as provided for in said certificates, said dividends amounting to the sum of $1,080.

13. That the plaintiff, after said default by said The American Warehouse Company in the payment of said dividends, duly notified the defendant of such defaults, and made written demand upon it for the payment of the amount of said dividends, due as aforesaid, such demand being in conformity with the terms of the aforesaid indorsement upon said certificates of said The American Warehouse Company.

14. That on 21 December, 1911, said The American Warehouse Company was adjudicated a bankrupt in the District Court of the United States for the Western District of North Carolina.

15. That the defendant, notwithstanding the matters and things above alleged, has neglected, failed, and refused and still refuses to pay to the plaintiff the dividends due him as above alleged, according to the terms of its said indorsement. Wherefore, the plaintiff prays judgment against the defendant, fixing its liability for the payment to the plaintiff of the dividends, as is provided by said indorsement, and for the sum of $1,080, with interest on $360 thereof from the third Wednesday in July, 1912, on $360 thereof from the third Wednesday in July, 1913, and on $360 thereof from the third Wednesday in July, 1914, and for the costs and for such other and further relief as the plaintiff may be entitled to.

The defendant demurred upon several grounds, in substance, as follows:

1. That The American Warehouse Company was authorized by its charter and undertook by its certificates of stock to pay dividends from earnings, and that it could, under the law of this State, pay them in no other way, and the defendants guaranteed only that if it earned and declared dividends they would be paid or honestly distributed to shareholders, and that as the guaranty refers solely to dividends "called for by the certificates of stock," and as no such dividends have accrued, there being no earnings, it follows that nothing is due under the guaranties declared on.

2. That there was no consideration for the contract of guaranty, but, on the contrary, it was entered into by certain officers of the defendant, having no authority to make the guaranty in its behalf, and this was well known to the plaintiff, as they knew defendant, under its charter, had no such power itself.

3. That as The American Warehouse Company could not pay dividends on its shares of stock, preferred or common, except from earnings, if it undertook to do so, its contract would not be enforcible, and, consequently, any guaranty of such a contract by the defendant would be void and of no effect.

4. That said warehouse company could not issue certificates of stock containing a promise to pay dividends of any kind therein beyond the corporate life of the company, and it being alleged in the complaint that the said company has been duly adjudicated a bankrupt in the proper court and has ceased to do business, its corporate activity is thereby suspended, and of course its power to earn and pay dividends, and, therefore, any obligation of the defendant arising out of its guaranty, if the latter is valid, has also been suspended, and cannot be revived until the defendant has been discharged and resumes its corporate functions as a going concern.

5. That the guaranty operates without limit, as defendant, by its charter, is a perpetual corporation, unless it is restricted to the life of The American Warehouse Company.

6. That as The American Warehouse Company could pay dividends only from earnings, and as it has been judicially declared to be a bankrupt, there can be no dividends, and, therefore, under the terms of the guaranty, there can be no liability to the plaintiff for any breach of the guaranty, if it is valid in itself.

7. That a contract of The American Warehouse Company to pay dividends, not out of its earnings, would be illegal and void, and any contract of the defendant guaranteeing that it would do so would be illegal and void, both under its charter and the general law.

8. That the alleged contract of guaranty is not authorized by the charter of the defendant, but is forbidden thereby and is *ultra vires,* and, therefore, void and of no effect.

9. It was also objected *ore tenus* that by a recent act of the General Assembly, Public Laws 1915, ch. 134, if a corporation is or has been adjudicated a bankrupt under the laws of the United States, its charter becomes forfeited without further action, unless its stockholders shall, within ninety days after 8 March, 1915, by resolution adopted by them, a duly certified copy of which shall be filed with the Secretary of State, determine to continue its corporate existence, and that it is not alleged in the complaint that any such action has been taken by the stockholders, and that in view of the dissolution of The American Warehouse Company by the forfeiture of its charter, under said statute, the liability of the defendant, if any, under its guaranty has ceased, as it was made with reference to the continued existence of The American Warehouse Company as a corporation.

The court overruled the demurrer, and defendant appealed.

*Manly, Hendren & Womble, Fuller & Reade for plaintiff.*

*A. D. Ivie, C. O. McMichael, E. S. Parker, Jr., Brooks, Sapp & Williams, King & Kimball for defendant.*

WALKER, J., after stating the case: This case, with others, involving substantially the same questions, was exhaustively discussed by counsel and well prepared briefs filed presenting numerous points; but we do not deem it necessary to consider more than two or three of them.

The defendant contends that there has been no breach of the guaranty, as it only extends to the payment of such dividends as are earned and declared by the warehouse company, and is, therefore, merely a contract to the effect that if such dividends are not paid, the guarantor will pay the same, which would amount to no more than a guaranty of the honesty and fidelity of the officers to pay dividends if earned and declared. This, we think, would be a very narrow construction of the contract of guaranty, and is one which we could not adopt. The principle in regard to the interpretation of such instruments as the one we are now considering may, as gathered from the authorities, be thus stated: When it is said that a guarantor is entitled to stand upon the strict terms of his guaranty, nothing more is intended than that he is not to be held liable for anything that is not within the express terms of the instrument in which his guaranty is contained; that his liability is not to be extended by implication beyond these limits, or to other subjects than those expressed in the instrument of guaranty. But for the purpose of ascertaining the meaning of the language which he has used, and thus determining the extent of his guaranty, the same rules of construction are to be applied as in the construction of other written instruments. His liability is not to be extended by implication beyond the terms of his guaranty as thus ascertained. The language used by him is, however, to receive a fair and reasonable interpretation for the purpose of effecting the objects for which he made the instrument, and the purpose to which it was to be applied. If this language is fairly susceptible of two interpretations, either of which is within the spirit of the guaranty, he is not at liberty to say that the person to whom it is given was not justified in acting upon either, or that he should have acted upon one rather than the other. *London, etc., Bank v. Parrot,* 125 Cal., 472; 1 Brandt on S. and G., sec. 103; *E. C. Ry. Co. v. Maryland Casualty Co.,* 145 N. C., 114; 20 Cyc., 1423. This guaranty means what its terms express, that if the warehouse company fails, in any one year during the continuance of the contract, to pay "the dividends, or any part thereof, called for upon the face of the certificate," the defendant agrees to pay any and all such deficiency in the dividend as may arise from such failure. It is not a promise that the warehouse company will pay illegal dividends, for it does not require that the latter will pay, at all events, so much money, but that it will pay any deficiency only in the event that the warehouse company fails to declare and pay its stock dividends from

its earnings, and that is what it clearly means. If the warehouse company fails to earn, declare, and pay any part of its dividend, the amount to be paid would be 6 per cent on the· par value of the stock, and if it earns, declares, and pays but a part, then the difference between the amount so paid and the full dividend of 6 per cent would be the amount due under the guaranty. *Lorillard v. Clyde,* 142 N. Y., 456 (24 L. R. A., 113). It was in no sense a guaranty that the warehouse company would do the illegal act of declaring a dividend, not payable from earnings applicable thereto, but from its other assets. We will. incidentally touch upon this question again when discussing the relation of the warehouse company to this contract of guaranty. We, therefore, decline to hold that the guaranty of the defendant is illegal, because, as defendant contends, it calls for the performance of an unlawful act by the warehouse company.

It is next contended by the defendant that the contract of guaranty is not within the corporate powers of the defendant company as conferred by its charter, which fixes the limit of its authority to contract. ·This is a very serious question and is involved in very grave doubt, but we do not consider that a decision of it is indispensable to a full disposition of this appeal, and, therefore, we may well omit any discussion of it, and withhold our views until we are required to decide it. This renders unnecessary any consideration of the doctrine of *ultra vires* and estoppel, so fully treated by counsel in their briefs. We have now come to what we regard as one of the decisive questions in the case. It is alleged in the complaint, and of course admitted by the demurrer, that the warehouse company has been adjudged to be a bankrupt by a Federal court having jurisdiction of the case, and it has ceased to do business, its affairs and assets now being under the control and management of that court for the purpose of being administered according to the Federal statute in such cases made and provided. It is not, therefore, a going concern; its functions as a corporation being, at least, suspended, and since the adjudication of its bankruptcy, viz., on 8 March, 1915, the Legislature by a public statute ratified on that day declared the charter of all corporations to be forfeited if they had been adjudicated bankrupts. We will refer to these matters more specifically hereafter.

In this state of the case, we must inquire what effect the bankruptcy and the forfeiture of its charter had upon the contract of guaranty sued on. The plaintiff says that they have no effect to change the obligation of the defendant or to terminate its liability upon the guaranty, while defendant insists that its obligation and liability have ceased and been determined thereby, as the contract was made in contemplation of the continued existence of the warehouse company as a corporation, and when it forfeited its charter ·by reason of its bankruptcy, and was

dissolved, it ceased to exist as a corporation, and there was nothing left to be done with respect to it but to wind up and settle its affairs; that it ceased to have any earning capacity, so as to make and declare dividends, and its stock is held by its shareholders, including the plaintiff, only for the purpose of a final adjustment of its affairs and the distribution of its assets among those entitled thereto, whether creditors or stockholders.

We will first consider whether the contract of guaranty was made with reference to the continued existence of the corporation whose stock is held by the plaintiff. While the warehouse company is not a party to the guaranty, nor privy thereto, in the sense that, in law, it is at all liable thereon either to the plaintiff or to the defendant, or they to it, yet the continued existence of the company was a thing contemplated by both parties when they made the contract, and performance was impliedly made to depend upon it. They understood that as the basis of the contract there should be a corporation capable of earning dividends—not that it should actually earn them, but that it should be potentially able to do so; and this could not be said of a corporation which had lost its charter and had ceased to do business. This was not an original and independent promise to pay each year, at all events, the equivalent of a full or partial dividend, without regard to the earning capacity or existence of the corporation, but the guaranty imposed a secondary liability, that is, one to pay so much provided that the warehouse company failed to earn and pay. The promise was, therefore, not absolute, but conditional. The failure of the other corporation to pay was to precede any liability on the part of the defendant, and this could not be so unless the former continued to have the capacity to earn and pay. Its continued existence was, therefore, presupposed by the parties. This question was substantially involved in *Lorillard v. Clyde,* 142 N. Y., 456. The contract of guaranty in that case was to last for seven years, but the corporation the payment of whose dividends was guaranteed was dissolved before the expiration of. that time, and the Court said: "The question whether the obligation of the defendants under their guaranty continued in force as to the part of the seven years unexpired at the time of the dissolution of the corporation, in the absence of any responsible agency of either party for the causes which led to the dissolution, must be determined by the intention of the parties as ascertained from the language of the contract, and, if ambiguous, from such language and the surrounding circumstances. The contract contains no explicit statement on the subject. It assumed that the corporation would be in existence during the whole period over which the guaranty extended. The guaranty was not for the yearly payment of a sum equal to 7 per cent on

38—171

the capital of the plaintiff in the corporation, or on the nominal amount of his stock. It was that the dividends of the corporation should annually for seven years equal that sum. The plaintiff would under the contract and by virtue of his right as a stockholder be entitled to dividends declared by the company, whether they should be more or less than 7 per cent per annum, and if dividends less than that amount should be made, the liability of the defendants on their guaranty would be limited to a sum sufficient to make up the deficit. In case the dividends equaled or exceeded 7 per cent, there would be no liability; and in case no dividends were declared, then the guaranty would stand in lieu of dividends." And again it was said with reference to the same question: "It is incontrovertible that the right to manage the business of the corporation and to earn and to receive the commissions on freight were the considerations upon which the guaranty rested. The plaintiff conceded these rights to the Clydes for this equivalent. The defendants could receive the benefits of the contract only in case the corporation should continue in being during the running of the guaranty. The death of the corporation would terminate their management, and prevent their earning commissions; the business would end, and the court, in administering the assets, would return to each party his proportion of the capital remaining for distribution. The death or dissolution of the corporation would withdraw all the capital invested so far as it remained, and take away for the future the whole consideration upon which the guaranty was based. There would thereafter be no corporation earning or capable of earning dividends, and nothing left upon which the obligation to pay them could be predicated:

"The general doctrine that when a party voluntarily undertakes to do a thing, without qualification, performance is not excused because, by inevitable accident or other contingency not foreseen, it becomes impossible for him to do the act or thing which he agreed to do, is well settled. This doctrine protects the integrity of contracts, and one of the reasons assigned in its support in the early case of *Paradine v. Jane,* Aleyn, 26, is that as against such contingencies the party could have provided by his contract. See *Harmony v. Bingham,* 12 N. Y., 99, 62 Am. Dec., 142; *Ford v. Cotesworth,* L. R., 4 Q. B., 134; *Jones v. United States,* 96 U. S., 24, 24 L. Ed., 644. But it is now well settled that when performance depends on the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing puts an end to the obligation. Executory contracts for personal services, for the sale of specific chattels, or for the use of a building are held to fall within this principle. *Dexter v. Norton,* 47 N. Y., 62; *People v. Globe Mut. L. Ins. Co.,* 91 N. Y., 174; *Taylor v. Caldwell,* 3 Best and S., 826. These cases are not exceptions to the rule that con-

tracts voluntarily made are to be enforced, but the courts, in accordance with the manifest intention, construe the contract as subject to an implied condition that the person or thing shall be in existence when the time of performance arrives. So if after a contract is made the law interferes and makes subsequent performance impossible, the party is held to be excused. *Jones v. Judd,* 4 N. Y., 412. It must be conceded that it is difficult to draw the line and to determine the exact limitations of the principle. When the executory contract relates to specific chattels, and the subject-matter is destroyed without fault of the party, the implied condition arises and excuses performance. But where the contract is based on the assumed existence and continuance of a certain condition, or upon the continuance of a subject-matter which, however, is not the direct object of the contract, is the principle in such cases excluded? The present case illustrates what we have in mind.

"The contract in question was not with the corporation whose life was extinguished by the judgment of dissolution. But the guaranty assumed that the corporation would continue in existence during the seven years period. The liability which the defendants assumed was in consideration of the benefits which might accrue to them from the management of the transportation business of the corporation during that period.

"Upon the assumption that the death of the corporation was brought about without their fault, were they thereafter bound? Is the doctrine of implied condition less applicable than it would be if the contract had been between the defendants and the corporation? If in the one case the contract, so far as it was unexecuted, would be terminated, did not the happening of the same event terminate the engagement of these parties, based on the assumed continuance of the corporation in life?"

A similar contract was construed in *Columbus Trust Co. v. Moshier,* 100 N. Y. Suppl., 1066, and the Court held: "There is an express provision in the agreement referred to which makes the continuance of the corporate life of the company a condition precedent to the right to enforce the provisions thereof. As a general rule, the unqualified undertaking of a party to perform an act is not to be excused because the situation existing when the contract was made did not continue to exist at the time stipulated for performance. *Labaree Co. v. Crossman,* 100 App. Div., 501, 92 N. Y. Suppl., 565; *Lorillard v. Clyde,* 142 N. Y., 456, 37 N. E., 489, 24 L. R. A., 113. This rule, however, is not without exceptions; and where performance depends on the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing puts an end to the obligation.

*Lorillard v. Clyde, supra; Babbitt v. Gibbs,* 150 N. Y., 281-286, 44 N. E., 952; *Herter v. Mullen,* 159 N. Y., 28, 44; 53 N. E., 700, 44 L. R. A., 703, 60 Am. St., 517; *Matter of Daly,* 58 App. Div., 49, 68 N. Y. Suppl., 596. In such cases the courts have implied a condition in the contract that a party is relieved from its terms when its performance has, without his fault, become impossible. *Herter v. Mullen, supra."* . . . "I think it clear that it was within the contemplation of both parties that the corporation should continue to exist during the life of the contract of guaranty, and that an implied condition should be read into the contract to that effect. The agreement was not to pay a sum equal to the amount of a dividend, whether declared or not, but was a guaranty that dividends should be paid. The payment of a dividend necessarily implies the existence of a corporation. The word 'dividend,' when used in connection with corporate stock, means a proportionate part of the profits which have arisen from corporation transactions. They are payable out of profits alone. Taylor Priv. Corp., secs. 563, 565; 2 Purdy's Beach Priv. Corp., secs. 451, 453. Again, the agreement had reference to the sale of the capital stock in the company. Capital stock is the interest which the members of a corporation (the stockholders thereof) have in the property of the corporation. 1 Purdy's Beach Priv. Corp., sec. 184. When the corporation ceased to exist and its property was distributed there was no longer any capital stock. When the corporate stock was wiped out, of necessity there could be no profits from corporate transactions, nor any possibility thereof. Without the possibility of profits from corporate transactions, there could be no dividends. The contract of guaranty did not fix a specific amount which Mr. Harrison was to receive. It provided that he should receive at least 3 per cent dividends. But so long as he remained the owner of the stock, he or his transferee, if he had transferred the same, would be entitled to receive all of the dividends earned and declared on such stock. If such dividends amounted to 10 per cent semiannually, the holder of the stock would be entitled to receive that. If it amounted to only 2 per cent semiannually, the holder of the stock would receive that amount from the company and could then hold the guarantor for the difference between the 2 per cent dividends received and the 3 per cent dividends guaranteed. This being so, the implied condition above referred to must be read into the contract, and it must be presumed that the parties contracted with reference to the continued existence of the corporation. Since this was the basis of the agreement, the destruction of the corporation terminated the obligation. This seems to me to be true both upon principle and authority. *Mason v. Standard Distilling and D. Co.,* 85 App. Div., 521; 83 N. Y. Suppl., 843; *Lorillard v. Clyde, supra."* That case was affirmed in 193 N. Y., at p. 634.

The question, therefore, is whether the guaranty becomes wholly in-operative for want of something to which it is applicable, or whether, on the other hand, it can be understood as binding the defendant to pay the deficiency of the dividend in any contingency and to respond in damages to an equivalent amount in case of failure. The latter is the theory of the plaintiff, reading the contract as one not dependent in the least upon the corporate capacity of the warehouse company to earn and pay dividends and as operative without any regard to its continued corporate existence. We cannot assent to this view. It is not what the language of the contract imports, and evidently not what the parties intended. The condition precedent to liability on the guaranty was the existence of a corporation having stock and capable of earning and paying dividends thereon, but not necessarily able to do so. This was made an essential element of the guaranty. It re-ferred necessarily to a live and not a dead corporation. We would not properly refer to a defunct or dissolved corporation as one which could earn or pay annual dividends. It would be proper to refer to the part or share to be received in the final *division* of its assets by its creditors or shareholders as a *dividend,* but that is not the kind of divi-dend which was intended by the parties to this guaranty when they used that word; but it is perfectly clear, on the contrary, that they meant an annual dividend, and nothing else. The language is if the warehouse company fails to pay its annual dividend. The contract must have a natural and reasonable construction. *Justice Cooley* said of this question in *Lockhart v. Van Alstyne,* 31 Mich., at p. 79: "A dividend to the stockholders of a corporation, when spoken of in refer-ence to *an existing organization engaged in the transaction of business,* and not of one being closed up and dissolved, is always, so far as we are aware, understood as a fund which the corporation sets apart from its profits to be divided among its members. . . . A dividend among preference stockholders exclusively is understood to imply that the sum divided has been realized as profits, though the earnings do not yield a dividend to the stockholders in general. We hazard nothing in say-ing that this is the primary and universal understanding of a dividend on stock, except when made use of in respect to a final closing up and distribution of assets on the occurrence of insolvency or in view of a dissolution." No one can well read this guaranty without being con-vinced that the parties intended and contemplated the continuance of the life of the company, whose default in paying annual dividends should raise a liability upon the guaranty to pay the liquidated dam-ages. As a dead corporation could not pay the dividends, it was not in the minds of the parties when they drew their contract.

We have a case in our own Reports which clearly affirms the validity of the principle herein applied. *Steamboat Co. v. Transportation Co.,*

166 N. C., 582, at 587, 589. There the object of the contract was frustrated by the destruction of the property to which it mainly related, as nearly all courts seem to hold, and this Court held it fell within the exception to the rule that the obligation of a contract is imperative, which applies generally, but which is subject to the qualification that when the principal subject to which the contract relates ceases to exist, the obligation is at an end, citing and approving 9 Cyc., p. 627 *et seq.,* it being said at p. 631: "Where from the nature of the contract it is evident that the parties contracted on the basis of the continued existence of the person or thing to which it relates, the subsequent perishing of the person or thing will excuse the performance. Thus, where the contract relates to the use or possession or any dealing with specific things in which the performance necessarily depends on the existence of the particular thing, the condition is implied by the law that the impossibility arising from the perishing or destruction of the thing, without default in the party, shall excuse the performance, because, from the nature of the contract, it is apparent that the parties contracted on the basis of the continued existence of the subject of the contract."

It appears, therefore, that the ground upon which the promisor is excused from performance is that from the nature of the contract there is an implied condition that the thing upon which it depends will continue to exist. We take this to be the rule as declared in *Taylor v. Caldwell,* 3 Best and Smith, Q. B. (113 E. C. L., Ed. 1867), 824:

1. Where there is a positive contract to do a thing, not in itself unlawful, the contractor must perform it or pay damages for not doing it, although in consequence of unforeseen accidents the performance of his contract has become unexpectedly burdensome or even impossible.

2. But this rule is only applicable when the contract is positive and absolute, and not subject to any condition either express or implied.

3. Where from the nature of the contract it appears that the parties must from the beginning have known that it could not be fulfilled unless when the time for the fulfillment of the contract arrived some particular specified thing continued to exist, so that, when entering into the contract, they must have contemplated such continuing existence as the foundation of what was to be done; there, in the absence of any express or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without default of the contractor.

This was recognized as a rule in itself in Blackburn on Sales, p. 173. There are instances where the implied condition is of the life of a human being, but there are others in which the same implication is made as to the continued existence of a thing, or of an equity having a

corporate, though artificial, as distinguished from a natural life, both being liable to perish. It is not a new doctrine, but quite an ancient one, for Pothier in his treatise on the Contract of Sale (*Traité du Contractde Cente*), part 4, sec. 307 *et seq.,* and part 2, ch. 1, sec. 1, art. 4, sec. 1, thus states the same rule: "The vendor should be freed from his obligation when the thing sold has perished without his fault, is a consequence of another principle, that every obligation *de certo corpore* is destroyed when the thing ceases to exist, *Traité des Obligations,* part 3, ch. 6. This principle is founded in the nature of things, for the thing due being the subject of the obligation, it follows that when the thing ceases to exist the obligation can no longer exist, not being capable of existing without a subject." See Blackburn on Sales, marg. p. 173.

The case of *Atkinson v. Schoonmaker,* 12 Mo. App., 425, is somewhat like the one under consideration. There the performance of the contract depended upon the continued existence of a corporation, a gaslight company, which was placed by order of a court in the hands of a receiver, and it was held that its corporate life or activity was suspended, and that the contract of the third parties, who had assumed the obligation declared on, could not be enforced during the period of the receivership. And in *Appleby v. Myers, infra, Justice Blackburn* said, in substance, that when the subject to which the contract related is destroyed without fault on either side, so that performance becomes impossible—that is, the kind of performance contemplated by the parties—it is a misfortune affecting both parties, and *excusing* them from further performance of the contract, *but* giving a cause of action to neither. Many cases could be gathered here in illustration of the principle and showing how variously it has been applied by the courts. We will only cite a few of them. *Lovering v. B. M. Coal Co.,* 54 Pa. St., 291; *Malcolmson v. Wappoo Mills,* 88 Fed., 680; *Livingston County v. Graves,* 32 Mo. App., 478; *Walker v. Tucker,* 70 Ill., 527; *Ward v. Vance,* 93 Pa. St., 499; *Appleby v. Myers,* L. R. 2 C. P. (Exch. Ch.), 650, citing *Taylor v. Caldwell, supra,* and referring especially to an extract therefrom in which *Justice Blackburn* states the doctrine very clearly. See, also, *The Tornado,* 108 U. S., 342, where it was said that there was a condition implied from the nature of the contract that a certain ship would remain seaworthy and capable of earning freight, but had become disabled before she had broken ground for her voyage. The court held that the parties were excused from performance. In that case the reason for the rule was said to be that without "any express stipulation that the destruction of the person or thing shall excuse the performance," "that excuse is by law implied, because from the nature of the contract it is apparent that the parties contracted on the basis of the continued existence of the particular person or chattel." The case cites *Taylor v. Caldwell, supra,* and *Appleby v. Myers, supra.* In

*Walker v. Tucker, supra,* the Court said at p. 543 : "It is elementary law that when the contract is to do a thing which is possible in itself, the promisor will be liable for a breach thereof, notwithstanding it was beyond his power to perform it, for it was his own fault to run the risk of undertaking to perform an impossibility, when he might have provided against it by his contract. 1 Chitty on Conts. (11 Am. Ed.), 1074. But where, from the nature of the covenant, it is apparent the parties contracted on the basis of the continued existence of a given person or thing, a condition is implied that, if the performance became impossible from the perishing of the person or thing, that shall excuse such performance. *Ib.,* 1076.

Several cases show that the doctrine applies where performance has become impossible by act of the law, as in the case where a receiver is appointed to take charge of the affairs of a corporation; and bankruptcy, of course, is within the same category; and so it was said, substantially, in *Malcolmson v. Wappoo Mills, supra* : It is a well settled rule of law that if a party, by his contract, charge himself with an obligation possible to be performed, he must make it good unless its performance be rendered impossible by the act of God, *the law,* or the other party. Unforeseen difficulties will not excuse him. *Dermott v. Jones,* 2 Wall., 1. But, as appears, the complete fulfillment of the contract was prevented by the order of this Court in the appointment of the receiver. A delivery of the rock by the company after that was impossible. It will be noticed, also, that the completion of the contract on the part of Mitsui & Co. was by the same action of the Court made impossible. If the company had tendered the delivery of the rock, the injunction of this Court forbade them to accept it. In like manner they could not have paid to the company the price of the rock. But when the contract cannot be specifically performed, and the only remedy is by way of damages, the court will not inflict such damages on the corporation if the breach of contract for which damages are sought has been occasioned by the law, the performance of the contract having been made impossible, citing *People v. Globe Mutual Life Ins. Co.,* 91 N. Y., 174. In the latter case, a corporation had entered into a contract with a general agent for his services for a specified time and at a stipulated salary. The contract continuing, and the services being rendered, the corporation was placed in the hands of a receiver, who did not continue the agent in his employment. He sued for damages. The court held that he could not recover, because, as it said, the company could not employ him, for the reason that it would be a violation of the order of injunction. The agent could not meddle in the affairs of the company, for that equally would violate the injunction. It was *damnum absque injuria.* The court adopted the principle as stated in the New York cases. The supposed answer to the

application of this established doctrine is that the contract would be of no value in such a case; but this is a total misapprehension of the nature and scope of the contract and the principle. If the warehouse company had continued to exist as an active concern, capable of earning dividends, the contract would have remained in full force and effect during its corporate life, and the guaranty was made upon that basis, if we are to be governed by its terms. So it is clearly seen that the contract was of value and great value, too.

As was said in one of the cases, it is the misfortune of the plaintiffs that something happened which does not seem to have been anticipated, and, therefore, was not provided against in the contract. There is a substantial promise to guarantee payment, to which the law annexes the condition that it shall last only during the life of the warehouse company, because, in the absence of a negative provision, it will read such a term into the contract as one naturally arising from what is expressed. This discussion, of course, assumes (without deciding) the validity of the contract in other respects.

We conclude, therefore, both upon reason and authority, that a guaranty such as we have in this case is at an end when the company whose stock is to pay the dividend has been dissolved. This brings us to a consideration of the methods by which a corporation is dissolved.

The Constitution of this State provides, in Art. VIII, sec. 1: "Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes and in cases where, in the judgment of the Legislature, the object of the corporations cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time, or repealed." A well known text-writer says: "Although it has been frequently said that there are but four ways in which corporations may be dissolved, yet on a little reflection it appears that there are five ways: (1) By the expiration of the term of existence granted by the Legislature, either in its charter where it is organized under a special charter, or under its governing statutes where it is organized under a general law; (2) by an act of the Legislature, where power has been reserved for that purpose either in its charter where it is created by a special charter, or in a constitutional provision or a general statute operative upon it; (3) by a surrender of its franchises, which is accepted, and a voluntary dissolution; (4) by a loss of all its members, or of an integral part, so that the exercise of corporate functions cannot be restored; (5) by a forfeiture of its franchises by a judicial proceeding, usually an information in the nature of a writ of *quo warranto,* but sometimes, under the operation of statutes, a proceeding in a court of equity, which at the same time winds up the corporation and distributes its assets." 10 Cyc., 1270. And again it is said in Cyc., at p. 1272: "Charters are

protected from legislative alteration or repeal unless the power to alter or repeal has been reserved by the Legislature in making the grant of the franchises, either in the particular act in which the grant is embodied or in some general law applicable to the subject. In the latter case a statute dissolving a corporation and annulling its charter is not unconstitutional. Where this reservation has been made, a corporation may be dissolved by an act of the Legislature repealing its charter. Where the Legislature has reserved to itself the power to repeal, and exercises it, the courts will not presume that the power has been improperly or unconscionably exercised." It is provided in the Revisal that a corporation may be dissolved voluntarily by proceedings taken as set forth in section 1195, and, under section 1196, dissolution may further take place under judgment of a court having jurisdiction in a civil action brought by a stockholder or a creditor, or by authority of the Attorney-General in the name of the State for the causes therein enumerated, and, among them, "if the corporation shall become insolvent, or shall suspend its ordinary business for want of funds to carry on the same, or be in imminent danger of insolvency, or has forfeited its corporate rights." But, as already shown, the Legislature had the power to declare the charter of a corporation to be forfeited, and thereby to dissolve it.

We need not discuss the question whether the law of 1913 can be made to operate retrospectively, as we are of the opinion that the adjudication of bankruptcy had the same effect substantially and *pro tempore* as a dissolution of the corporation. It may be conceded that bankruptcy does not, of itself, work a dissolution of the corporation, as in the sententious language of *Judge Bleckley* in *Bolland v. Heyman,* 60 Ga., 181: "It is not the purpose of the bankrupt law to dissolve corporations. The assets are seized, but the franchise is spared. 'Your money,' not 'your life,' is the demand made by the bankruptcy act." But the company for the period of its bankruptcy has ceased to do business, and as completely lost its capacity to earn dividends as if its corporate life had become extinct. Where there is the same reason there must be the same law.

While it is not essential to a disposition of this appeal that we should commit ourselves to any special view regarding the power of the Legislature to pass the retroactive clause of the law of 1913, and we will not do so, it may be well to reproduce here the clear exposition of the law by *Justice Harlan* in respect to the scope and effect of the reservation in constitutions or statutes to amend or repeal charters granted to corporations, which we find in *Hamilton G. & C. Co. v. City of Hamilton,* 146 U. S., 258 (L. Ed., 963), as follows: "This reservation of power to alter or revoke a grant of special privileges necessarily became a part of the charter of every corporation formed

under the general statute providing for the formation of corporations. A legislative grant to a corporation of special privileges, if not forbidden by the Constitution, may be a contract; but where one of the conditions of the grant is that the Legislature may alter or revoke it, a law altering or revoking, or which has the effect to alter or revoke, the exclusive character of such privileges, cannot be regarded as one impairing the obligation of the contract, whatever may be the motive of the Legislature, or however harshly such legislation may operate, in the particular case, upon the corporation or parties affected by it. The corporation, by accepting the grant subject to the legislative power so reserved by the Constitution, must be held to have assented to such reservation. These views are supported by the decisions of this Court. In *Greenwood v. Union Freight R. Co.,* 105 U. S., 13, 17 (26: 961, 963), the question was as to the scope and effect of a clause in a general statute of Massachusetts providing that every act of incorporation passed after a named day 'shall be subject to amendment, alteration, or repeal at the pleasure of the Legislature.' This Court, referring to that clause, said: 'Such an act may be amended; that is, it may be changed by additions to its terms or by qualifications of the same. It may be altered by the same power, and it may be repealed. What is it may be repealed? It is the act of incorporation. It is this organic law on which the corporate existence of the company depends which may be repealed, so that it shall cease to be a law; or the Legislature may adopt the milder course of amending the law in matters which need amendment, or altering it when it needs substantial change. All this may be done at the pleasure of the Legislature. That body need give no reason for its action in the matter. The validity of such action does not depend on the necessity for it or on the soundness of the reasons which prompted it. The words 'at the pleasure of the Legislature' are not in the clauses of the Constitution of Ohio or in the statutes to which we have referred. But the general reservation of the power to alter, revoke, or repeal a grant of special privileges necessarily implies that the power may be exerted at the pleasure of the Legislature."

The plaintiff contends that a clause has been inserted in the guaranty which specially fixes its duration and provides that it shall continue during the life of the defendant company; but this was also true in the case of *Lorillard v. Clyde, supra,* as the time there was seven years from the date of the guaranty, and the corporation was dissolved within that period. The clause in the guaranty upon which plaintiff relied does not prevent the application of the principle we have discussed. It merely limits the extreme duration of the guaranty. It was held in the able and exhaustive opinion of *Justice Andrews,* speaking for a unanimous Court in *Lorillard v. Clyde, supra,* that this did not

prevent the full application of the principle; that the contract of guaranty was made with strict reference to the continuance of the defendant's corporate life and its capacity to earn dividends, this being the indispensable condition upon which the guaranty should continue to be effective, and the very basis upon which it rested. The bankruptcy, while it did not destroy the life of the defendant company, suspended its corporate capacity and the exercise of its corporate functions, and it ceased altogether to be a going concern, capable of earning dividends. It was dormant, if not dead, for all practical purposes. Our view is greatly strengthened by the position taken by the plaintiff, that the guaranty is not one conditioned upon the payment of a dividend by the warehouse company, whether earned or not, but only upon the payment of the dividend "called for by the certificate," which is an earned dividend, and the promise is to pay any deficiency therein which may occur in any one of "the consecutive years" succeeding the date of the guaranty. The parties contemplated that there should, at least, be a chance for the company to make profits and pay dividends.

The case of *Kernochan v. Murray,* 2 L. R. A. (N. Y.), 183, is not in point, as there the guarantor, who was an individual, and not a corporation, died. This, of course, did not affect the guaranty. In our case, the warehouse company is not the guarantor, nor is it even a party to the contract, but an outsider, with reference to whose continued life, as a corporation, the contract was made, which presents a case very different from *Kernochan v. Murray, supra.* Nor is *Cownie v. Dodd,* 149 N. W., 904, any more applicable, for there the provision was that the guaranty should continue "until said stock has been retired"; and this event never happened. As stated by plaintiff in his brief, "the court held that the time limit of the guaranty was not the life of the corporation, but until the stock had been *retired.*" The company had ceased to do business, but this did not "retire" its stock, and, therefore, the "time limit" had not been reached. The Court, in that case, stated that the principle we have applied to this case had been recognized and established in several decisions. It is to be noticed that *Kernochan v. Murray* is a New York case, and the Court of Appeals of that State, as we have seen, sustains our view; but neither of the two cases cited by the plaintiff conflicts with anything we have said, but both are in entire harmony therewith.

As the warehouse company was a bankrupt when this action was commenced, and its business was suspended, so that it could not earn dividends, our conclusion is that the plaintiff had no cause of action on the guaranty at that time. Whether the guaranty has ceased for all time to be operative because it has reached the limit of its duration by the dissolution of the corporation, we are not required to declare.

We have not, for the reasons already stated, considered the reason-

ableness of the contract of guaranty, if it bears the construction which the plaintiff insists that it should have, nor the other objections to its validity which the defendant has discussed in its brief.

There was error in the judgment of the court. It will be reversed and the demurrer sustained.

Reversed.

CLARK, C. J., dissenting: The guarantee given by the defendant, upon which this action is brought, is as follows: "In each and every consecutive year from and after this date, should the dividends or any part thereof called for upon the face of the within certificate not be paid on its due date, for value received, the Spray Water Power and Land Company guarantees and binds itself to pay in cash, ten days after notice of such default, to the holder of the within certificate, any such deficiency in the dividend as may arise from the failure of the American Warehouse Company to pay its annual dividend as stated in said certificate. This agreement is binding during the life of the Spray Water Power and Land Company."

The sole question presented is 'the meaning of the above guarantee. Probably there is no other case in the books which presents a guarantee in exactly the same words, and it would be small, if any, aid to consider the construction placed by other courts upon guarantees more or less dissimilar.

Even if there had been presented to other courts a guarantee in these identical words, there has been none in our court. The construction of this guarantee should not be complicated by the view taken of more or less dissimilar guarantees by other courts. The sole question is the construction of the words, and their intent as derived from the four corners of the guarantee itself. It is a question of the meaning of these plain English words.

A guarantor on a note, bond, or other obligation is not released because the promisor or obligor becomes insolvent, bankrupt, or dies. His guarantee is to provide against the risk of those very contingencies.

It can make no difference that the promisor, or obligor, and the guarantor are corporations.

The original obligation of the American Warehouse Company is to pay 6 per cent preferred, accumulative, dividends on its certificates during the life of the obligor company, which was chartered for thirty years. When that company fails to pay, whether because it does not earn dividends or dies by legal dissolution or bankruptcy, the guarantor faces the very contingency provided for by the guarantee, and for which it was exacted.

The guarantor company is specially authorized by its charter to make this guarantee. The guarantee specifies that it "is binding during the life of the Spray Water Power and Land Company." This leaves no doubt as to the duration of the guarantee.

Whether this duration would be restricted to the thirty years chartered life of the American Warehouse Company should its life not be extended by a renewal of the charter of that company is a question not presented. The guarantee cannot be for less than thirty years in any event, and it was given to secure the payment of the accumulative 6 per cent dividends should the American Warehouse Company fail to pay such dividends, regardless of the cause of the default—whether such default is caused by the failure to earn dividends or by legal dissolution or bankruptcy or any other cause.

This is the plain language of the guarantee. If it was not given for that purpose, and the guarantor is absolved either by failure to earn dividends or by the legal dissolution or bankruptcy of the Warehouse Company, it is difficult to conceive for what purpose the guarantee was required. It was intended to add something to the security afforded by the obligation of the original obligor, insuring against the contingencies by reason of which said company might fail or be unable to pay its dividends as stipulated.

BROWN, J., concurs in this opinion.