MRS. ROBERT H. PEASELEY, Executrix of the Will of ROBERT H. PEASELEY, Deceased v. VIRGINIA IRON, COAL AND COKE COMPANY, a Corporation

No. 89

(Filed 2 February 1973)

1. **Appeal and Error § 1— certiorari from Supreme Court to Court of Appeals — scope of review**

As a general rule the Supreme Court will consider only those aspects of a decision of the Court of Appeals which are assigned as error in the petition for *certiorari* and which are preserved by argument or the citation of authority with reference thereto in the brief filed by petitioner in the Supreme Court.

2. **Appeal and Error §§ 1, 68— denial of certiorari by Supreme Court — law of the case**

Determination by the Court of Appeals that defendant is liable to a broker's estate for sales commissions on coal shipped after the broker's death under a contract negotiated by the broker did not become the law of the case in the Supreme Court when the Supreme Court denied *certiorari,* and the Supreme Court could properly consider that issue upon allowing *certiorari* after another appeal of the case to the Court of Appeals where defendant properly preserved the issue in its petition for *certiorari* and its brief.

3. **Brokers and Factors § 2— brokerage contract — broker "or associates" — continuation after broker's death**

A contract which gave an independent broker "or his associates" the exclusive right to offer and sell defendant's coal to a power company was not a personal service contract that terminated at the broker's death but survived him and could be carried out by his associates.

4. **Contracts § 12— construction of contract — custom in trade or business**

General custom in the business or trade may be considered in arriving at the intention of the parties to a contract, and words of the contract referring to a particular trade will be interpreted by the courts according to their widely accepted trade meaning.

5. **Brokers and Factors § 1— brokerage contract — custom — servicing of account**

A contract giving an independent coal broker or his associates the exclusive right to "offer and sell" defendant's coal to a power company and "to sell this account," as construed by actions of the parties over a period of several years, required the broker or his associates to "service" the account with the power company by dealing with the power company on a day-to-day basis and handling all the problems that arose under a contract for the sale of defendant's coal to the power company.

**6. Brokers and Factors § 2— breach of coal brokerage contract**

Defendant's rejection of an offer by a deceased broker's secretary to continue servicing an account with a coal company and defendant's employment of another to service the account constituted a breach by defendant of a commission contract giving the deceased coal broker or his associates the exclusive right to offer and sell defendant's coal to the power company.

**7. Brokers and Factors § 6— coal brokerage contract — continuation after death of broker — right to commissions**

A commission contract giving an independent broker or his associates the exclusive right to sell defendant's coal to a power company and providing that the commission would be paid directly "to you" (the broker) contemplated that compensation was to be paid to the broker alone; at his death the right to receive the commissions inured to the benefit of his estate, and his executrix was the proper party to bring an action to recover commissions under the contract.

**8. Brokers and Factors § 6— breach of coal brokerage contract — damages — commissions less expenses**

In an action to recover for breach of a commission contract which allowed a broker's associates to continue the broker's exclusive right to sell defendant's coal to a power company after the broker's death and requiring the associates to service the account with the power company, the broker's executrix could recover the amount of the commission called for by the contract less such reasonable expenses as would have been incurred by the broker's associates in servicing the contract had they been permitted to do so, the burden being on plaintiff to show not only the commission lost but also to show the reasonable expenses which the associates would have incurred.

Justice HIGGINS dissenting.

Justice LAKE joins in the dissenting opinion.

ON *certiorari* to review the decision of the Court of Appeals reported in 15 N.C. App. 709, 190 S.E. 2d 690 (1972), which affirmed summary judgment for plaintiff entered by *Snepp, J.*, in chambers February 18, 1972, MECKLENBURG Superior Court.

The facts of the case may be summarized as follows: Plaintiff is the executrix and widow of Robert Peaseley, a deceased coal broker. Peaseley first began doing business with the defendant Virginia Iron, Coal and Coke Company in 1956. As a coal broker Peaseley endeavored to sell the coal of a number of producers to various companies that were in the market for coal. Normally, Peaseley would receive a commission of ten cents per ton of coal actually shipped to a buyer as a result of his efforts. Virtually all the coal which Peaseley sold for Virginia Iron, Coal and Coke Company was purchased by

Mill Power Company, the purchasing agent for Duke Power Company. The volume of coal which Peaseley sold for the defendant company increased each year after 1956, both in terms of actual amount and in proportion to Peaseley's sales for other coal producers. Prior to 1956 defendant had not sold any coal to Mill Power Company. In 1956 the total amount of coal sold by Peaseley was 565,000 tons; the amount sold for Virginia Iron, Coal and Coke Company was 10,620 tons. In 1957 he sold a total of 682,000 tons; the amount sold for the defendant was 103,000 tons. In 1958 he sold a total of 763,000 tons; the amount sold for the defendant was 182,000 tons. In 1959 he sold a total of 878,000 tons; the amount sold for the defendant was 430,000 tons.

In 1960 Peaseley and the defendant entered into a commissions contract which gave Peaseley the exclusive right to sell defendant's coal to Mill Power Company for use by Duke Power Company. The contract provided for Peaseley to receive a commission of ten cents per net ton of coal actually shipped to Mill Power Company and was to remain in effect as long as Peaseley was able to place for use by Duke Power Company approximately 420,000 tons per year of defendant's coal. The letter constituting the contract is as follows:

"Mr. R. H. Peaseley
802-04 Johnston Bldg.
Charlotte, N. C.

"Dear Mr. Peaseley:

"This is to confirm our conversation in my office August 16, 1960.

"Beginning September 1, 1960, the Virginia Iron, Coal and Coke Company gives to you or your associates the exclusive right to offer and sell all coal produced and/or sold by Virginia Iron, Coal and Coke Company to Mill Power Company for use by Duke Power Company.

"In consideration for the exclusive right to sell this account, you agree to limit your commission to (10¢) ten cents per net ton. This commission will be paid directly to you by separate remittance on tons actually shipped, determined by railroad weights.

"This agreement is to remain in effect as long as you are able to place for use by the Duke Power Company

comparable Virginia Iron, Coal and Coke Company tonnage as shipped in 1959, or approximately 420,000 tons per year.

"We look forward to a continuation of the pleasant business relationship we have enjoyed in the past.

Yours very truly,

s/ F. X. Carroll
Executive Vice President

FXC:JCE
"ACCEPTED:
s/ R. H. PEASELEY
Date: Sept. 6th, 1960."

From 1960 to 1963 the volume of coal shipped by defendant to Mill Power Company as a result of Peaseley's efforts continued to increase each year. In 1960 Peaseley sold a total of 691,000 tons altogether, of which Virginia Iron, Coal and Coke Company shipped 425,000 tons. In 1961 he sold 759,587 tons, of which defendant shipped 520,000 tons. In 1962 Peaseley sold 931,000 tons, of which defendant shipped 715,000 tons. In 1963 Peaseley sold a total of 1,060,585 tons, of which defendant shipped 876,000 tons.

In June 1963 Peaseley negotiated a contract between defendant and Mill Power Company for the annual sale of coal. In this contract Mill Power Company, as agent for its principal Duke Power Company, was referred to as "Buyer," and defendant was referred to as "Seller." Under the contract the Seller agreed to sell and deliver and the Buyer agreed to buy and accept, subject to the provisions of the agreement, 960,000 tons during the first year of the contract, ten per cent more or less, at Buyer's option. The quantity in subsequent years could be increased ten per cent over the preceding year at Buyer's option by giving Seller six months' written notice prior to the beginning of each new year. The new quantity would then establish the base for calculating the ten per cent differential in subsequent years. The contract was to become effective 1 July 1963 and to continue in force for a period of three years thereafter unless terminated at any time after the completion of the first year by either the Buyer or Seller giving twenty-four months' written notice of termination to the other party.

The contract further provided that the coal was to be shipped by the Seller and accepted by the Buyer in substantially

equal weekly quantities, with the Buyer designating periodically in advance to the Seller the destination to which the coal was to be shipped. Specifications for quality and type of coal to be delivered and a specified base and net price per ton were also provided, the price to be increased or decreased by changes in production costs beyond Seller's control.

From June 1963 until his death on 11 May 1965 Peaseley was paid ten cents per ton of coal shipped to Mill Power Company under this contract. During this period Peaseley devoted the greater part of his working time to activities related to this contract and spent considerable money servicing it.

After Peaseley's death defendant refused to pay his estate any commissions on the continuing sales under the 1963 contract. In November of 1965 Mr. Harry C. Birkhead was hired by defendant as vice president in charge of sales. His chief duty was to service the contract between defendant and Mill Power Company as Peaseley had done prior to his death. The 1963 contract remained in force until April 3, 1972, at which time it was cancelled in accordance with its terms.

On 22 November 1965 plaintiff, decedent's wife, as executrix of his estate, filed an action against Virginia Iron, Coal and Coke Company alleging that Peaseley had fulfilled his obligations under the 1960 commissions contract and plaintiff was entitled to judgment of ten cents per ton of coal delivered by defendant under the 1963 contract with Mill Power Company after Peaseley's death. Defendant answered contending that the 1960 commissions contract was for personal services and terminated with Peaseley's death, an event which made further performance impossible.

The case was first tried at the 26 February 1968 Schedule "A" Civil Session of Mecklenburg Superior Court before Judge Ervin. At the close of the plaintiff's evidence, the trial judge allowed defendant's motion for involuntary nonsuit, and from judgment dismissing the action plaintiff appealed to the Court of Appeals. The Court of Appeals reversed, stating in part:

"In the present case plaintiff has alleged and offered evidence tending to prove that coal was shipped by defendant after Peaseley's death under the very same coal contract which was the product of his skill and efforts as a salesman. In the absence of any evidence of an understand-

ing that defendant was to be relieved of commissions thereon, plaintiff is entitled to recover. . . . " *Peaseley v. Coke Co.*, 5 N.C. App. 713, 169 S.E. 2d 243 (1969).

Defendant petitioned this Court for a writ of *certiorari* which was denied.

On motion of plaintiff, summary judgment for the plaintiff was entered by Judge Snepp at the 4 January 1971 Schedule "D" Civil Session of Mecklenburg Superior Court holding defendant liable for commissions on coal sold under the contract negotiated by Peaseley delivered after his death. The issue of damages was retained for jury determination. Defendant appealed to the Court of Appeals which affirmed this summary judgment. Defendant again petitioned this Court for a writ of *certiorari* which was denied.

On 1 December 1971 plaintiff moved for summary judgment on the issue of damages. On 13 January 1972 defendant filed a response to plaintiff's motion for summary judgment and filed a cross-motion for summary judgment in its favor dismissing the action. On 26 January 1972 the parties entered into the record the following stipulations:

"The number of tons of coal shipped by the defendant to Duke Power Company from May 12, 1965, through the month of October 1971, under the terms of the contract between the defendant and Mill Power Supply Company dated June 19, 1963, as amended, on which the defendant has paid no commission either to the plaintiff or to the Estate of Robert H. Peaseley is 4,831,800 tons.

"If the plaintiff is entitled to commissions at the rate of ten (10¢) cents for each of the aforesaid 4,831,800 tons of coal, which the defendant does not admit but expressly denies, then the principal amount of such commissions would be $483,180.00."

On 18 February 1972 the parties entered into an additional stipulation:

"If the plaintiff is entitled to commissions of ten (10¢) cents for each of the 4,831,800 tons of coal, referred to in the aforesaid Stipulation of the parties, dated January 20, 1972—and the defendant does not admit but expressly denies that the plaintiff is so entitled—then the interest on

said commissions to the present date at six (6%) per cent per annum is $107,740.33."

Judge Snepp at the 18 February 1972 Session of Mecklenburg Superior Court entered summary judgment that plaintiff have and recover of defendant $590,920.33 with interest thereon at the rate of 6% per annum until paid. Defendant appealed to the Court of Appeals. That court in an opinion by Judge Hedrick, concurred in by Judges Brock and Morris, affirmed. On 8 November 1972 we allowed defendant's petition for a writ of *certiorari.*

*Helms, Mulliss & Johnston by E. Osborne Ayscue, Jr., and Fred B. Helms for defendant appellant.*

*Blakeney, Alexander & Machen by Whiteford S. Blakeney for plaintiff appellee.*

MOORE, Justice.

The Court of Appeals by its decision on the second appeal affirmed the judgment of the Superior Court, which held the defendant liable for unpaid commissions on sales subsequent to Peaseley's death and prior to the termination of the June 1963 contract. Plaintiff contends that when the Court of Appeals so held and this Court refused to allow *certiorari* that issue was definitively settled and became the law of the case.

In *Hayes v. Wilmington,* 243 N.C. 525, 91 S.E. 2d 673 (1956), this Court said:

> " . . . (I)t may be conceded that as a general rule when an appellate court passes on a question and remands the cause for further proceedings, the questions there settled become the law of the case, both in subsequent proceedings in the trial court and on subsequent appeal, provided the same facts and the same questions which were determined in the previous appeal are involved in the second appeal. . . . "

Therefore, when this case was appealed to the Court of Appeals the third time, that court was bound by its determination of the liability issue on the second appeal. The fact that the Court of Appeals was bound by its own decision does not mean, however, that this Court is similarly restricted by reason of its denial of *certiorari.*

G.S. 7A-31 provides the statutory authority for discretionary review by the Supreme Court of decisions of the Court of Appeals. This statute reads in pertinent part:

"(a) In any cause in which appeal has been taken to the Court of Appeals, except a cause appealed from the North Carolina Utilities Commission or the North Carolina Industrial Commission, and except a cause involving review of a post-conviction proceeding under article 22, chapter 15, the Supreme Court may in its discretion, on motion of any party to the cause or on its own motion, certify the cause for review by the Supreme Court, either before or after it has been determined by the Court of Appeals. . . . If the cause is certified for transfer to the Supreme Court after its determination by the Court of Appeals, the Supreme Court reviews the decision of the Court of Appeals.

\*    \*    \*

"(c) . . . when in the opinion of the Supreme Court

(1) The subject matter of the appeal has significant public interest, or

(2) The cause involves legal principles of major significance to the jurisprudence of the State, or

(3) The decision of the Court of Appeals appears likely to be in conflict with a decision of the Supreme Court. Interlocutory determinations by the Court of Appeals, including orders remanding the cause for a new trial or for other proceedings, shall be certified for review by the Supreme Court only upon a determination by the Supreme Court that failure to certify would cause a delay in final adjudication which would probably result in substantial harm."

Under this statute this Court is to review only those cases of substantial general or legal importance or in which review is necessary to preserve the integrity of precedent established by this Court. Denial of *certiorari* does not mean that this Court has determined that the decision of the Court of Appeals is correct. Denial may simply mean that in the opinion of this Court the case does not require further review under the provisions of G.S. 7A-31(c). This statute further specifically provides that discretionary review of interlocutory determinations by the Court of Appeals shall be exercised only in unusual cases

Peaseley v. Coke Co.

where failure to do so would cause a delay in final adjudication or which would probably result in substantial harm. Denial in such cases *may* only mean that this Court has determined that no such harmful result is likely to occur if the petition is denied. In the present case the third appeal to the Court of Appeals is the first appeal taken from a final judgment. Absent such special circumstances as referred to in the statute, this is the first time that discretionary review by this Court has been appropriate under the statute.

Justice Lake in *Builders Supplies Co. v. Gainey,* 282 N.C. 261, 192 S.E. 2d 449 (1972), commented on the effect of the denial of *certiorari.* In that case the trial court had directed a verdict for the defendant in a case in which plaintiff was seeking to be declared the owner of the right to remove sand and gravel from a certain tract of land. The Court of Appeals reversed and this Court denied *certiorari.* In its opinion the Court of Appeals called plaintiff's interest an easement. In a second appeal to the Court of Appeals, plaintiff's interest was denominated a *profit a pendre,* and a jury verdict for defendant was affirmed. This Court allowed *certiorari* and affirmed the Court of Appeals, but determined that plaintiff's interest was neither an easement nor a *profit a pendre.* Justice Lake stated: "Such [prior] denial [of certiorari] does not constitute approval of the reasoning upon which the Court of Appeals reached its decision."

In *State v. Case,* 268 N.C. 330, 150 S.E. 2d 509 (1966), this Court considered the effect of the denial of a writ of *certiorari.* In that case defendant was convicted of forgery. He petitioned for a writ of habeas corpus alleging certain errors in his trial and demanding release from prison. The trial judge ordered a new trial for errors committed in the first trial. Defendant petitioned for *certiorari* on two grounds. First, he said the judge erred in ordering a new trial which he did not want and had not requested. Second, he said the judge committed error in not ordering him released from prison. Defendant's petition for *certiorari* was denied by this Court. A new trial was held and defendant entered a plea of double jeopardy. The plea was not allowed, and defendant was convicted. This Court reversed, holding that defendant's plea of former jeopardy should have been allowed. In discussing the effect of the denial of *certiorari,* Justice Sharp quoted with approval Mr. Justice Frankfurter in *Brown v. Allen,* 344 U.S. 443, 97 L.Ed. 469, 73 S.Ct.

437 (1952) : "The denial of a writ of *certiorari* imports no expression of opinion upon the merits of the case. . . ."

The United States Supreme Court in *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 60 L.Ed. 629, 36 S.Ct. 269 (1916), dealt at length with the question of whether a denial of *certiorari* makes the lower appellate court's decision the final law of the case:

> "It is contended that this question is settled otherwise, at least as between these parties, by the decision of the circuit court of appeals on the first appeal, and our refusal to review that decision upon complainant's petition for a writ of certiorari, and that the only questions open for review at this time are those that were before the court of appeals upon the second appeal. This, however, is based upon an erroneous view of the nature of our jurisdiction to review the judgments and decrees of the circuit court of appeals by certiorari. . . . As has been many times declared, this is a jurisdiction to be exercised sparingly, and only in cases of peculiar gravity and general importance, or in order to secure uniformity of decision. [Citations omitted.] And, except in extraordinary cases, the writ is not issued until final decree. . . .

> "It is, of course, sufficiently evident that the refusal of an application for this extraordinary writ is in no case equivalent to an affirmance of the decree that is sought to be reviewed. And, although in this instance the interlocutory decision may have been treated as settling 'the law of the case' so as to furnish the rule for guidance of the referee, the district court, and the court of appeals itself upon the second appeal, this court, in now reviewing the final decree by virtue of the writ of certiorari, is called upon to notice and rectify any error that may have occurred in the interlocutory proceedings. [Citations omitted.]"

*Accord, Mercer v. Theriot*, 377 U.S. 152, 12 L.Ed. 2d 206, 84 S.Ct. 1157 (1964).

[1] As a general rule this Court will consider only those aspects of a decision of the Court of Appeals which are assigned as error in the petition for *certiorari* and which are preserved by argument or the citation of authority with reference thereto in the brief filed by the petitioner in this Court. In *State v. Williams*, 274 N.C. 328, 163 S.E. 2d 353 (1968), Justice Lake

discussed the scope of proper review on a petition for *certiorari*. In .that case defendant was found guilty of robbery by the use of firearms. In his appeal to the Court of Appeals, defendant assigned as error the admission of an identification by the prosecuting witness, the denial of his motion for judgment as of nonsuit, and a specified part of the instructions to the jury. The Court of Appeals affirmed the conviction finding no merit in any of the assignments of error. Defendant petitioned this Court for a writ of *certiorari*, which was allowed. In his petition and in his brief before this Court, the defendant did not discuss the denial of his motion for judgment as of nonsuit nor the alleged error in the instructions of the trial judge. Under these facts Justice Lake, speaking for the Court, said:

> "When this Court, after a decision of a cause by the Court of Appeals and pursuant to the petition of a party thereto as authorized by G.S. 7A-31, grants certiorari to review the decision of the Court of Appeals, only the decision of that Court is before us for review. We inquire into proceedings in the trial court solely to determine the correctness of the decision of the Court of Appeals. Our inquiry is restricted to rulings of the Court of Appeals which are assigned as error in the petition for certiorari and which are preserved by arguments or the citation of authorities with reference thereto in the brief filed by the petitioner in this Court, except in those instances in which we elect to exercise our general power of supervision of courts inferior to this Court. . . ."

[2]   Under our general supervisory power, we could review the entire record, but in the present case defendant in its petition for *certiorari* to this Court assigned as error decisions of the trial court and of the Court of Appeals throughout the course of the litigation and preserved these assignments by arguments or citation of authorities in its brief filed in this Court. Under these facts we hold that the previous denials of *certiorari* do not constitute approval of either the reasoning or the merits of the prior decisions of the Court of Appeals. On the present petition this Court may review the entire proceedings and consider any errors which have occurred during the course of the litigation provided the parties have taken the proper steps to preserve the questions for appellate review.

[3]   The Court of Appeals, by its decision on the second appeal of this case (12 N.C. App. 226, 182 S.E. 2d 810 (1971)),

affirmed summary judgment entered by Judge Snepp in favor of plaintiff on the question of defendant's liability for commission on coal sold to Mill Power Company under the contract of 1 July 1963 after plaintiff's testate's death. The defendant contends this was error. Defendant has never questioned its obligation to pay Peaseley commission on coal sold and shipped by it to Mill Power prior to Peaseley's death, but insists that the contract of 6 September 1960 was a contract calling for the personal services of Peaseley and as such was terminated by his death. Plaintiff to the contrary contends that Peaseley had performed all the duties required of him by the 1960 commissions contract when the contract of 1 July 1963 was executed, that the sale so far as he was concerned was completed, and that he was entitled to commission on all the coal delivered under that contract.

Obviously, many contracts calling for the services of a salesman are made on the basis of that salesman's personality, experience, contacts, knowledge, industry, and ability. Such attributes are personal to the salesman involved. For that reason courts have held that many contracts of this kind are not assignable by the salesman and do not survive his death, the rationale being that the death of the person who was to perform the personal services makes further performance impossible. *Stagg v. Spray Water Power and Land Co.*, 171 N.C. 583, 89 S.E. 47 (1916); *Siler v. Gray*, 86 N.C. 566 (1882). Cases from other jurisdictions supporting this proposition include: *Neely v. Havana Electric Railway Co.*, 136 Me. 352, 10 A. 2d 358 (1940); *Otis v. Adams*, 41 Me. 258 (1856); *Cutler v. United Shoe Mach. Corp.*, 274 Mass. 341, 174 N.E. 507 (1931); *Ruvbin v. Siegel*, 177 N.Y.S. 342, 188 App. Div. 636 (1919); *Folquet v. Woodburn Public Schools*, 146 Ore. 339, 29 P. 2d 554 (1934); *George v. Richards*, 361 Pa. 278, 64 A. 2d 811 (1949); *Blakely v. Sousa*, 197 Pa. 305, 47 A. 286 (1900); *Moran v. Wotola Royalty Corp.*, 123 S.W. 2d 692 (Tex. Civ. App. 1938); *Kanawha Banking & Trust Co. v. Gilbert*, 131 W.Va. 88, 46 S.E. 2d 225 (1947). However, in our view these cases are not pertinent to the decision in this case. Prior to the execution of the contract of 6 September 1960 defendant sent a proposed agreement to Peaseley which provided that "Beginning September 1, 1960 Virginia Iron, Coal and Coke Company gives to *you* the exclusive right to offer and sell. . . ." (Emphasis added.) Peaseley refused to accept this contract and returned it to defendant. Thereafter, at Peaseley's insistence the contract was rewritten

in its final form to provide that "Beginning September 1, 1960 the Virginia Iron, Coal and Coke Company gives to you *or your associates* the exclusive right to offer and sell. . . ." (Emphasis added.) Clearly, by the express terms of the contract entered into with complete knowledge of both parties not only Peaseley *but his associates* had exclusive right to sell defendant's coal.

In construing a contract the primary purpose is to ascertain the intention of the parties. *Realty Co. v. Batson,* 256 N.C. 298, 123 S.E. 2d 744 (1961) ; 2 Strong, N. C. Index 2d, Contracts § 12, p. 315. In the contract in question the parties made their intentions clear. Peaseley or his associates had the exclusive right to sell defendant's coal. The contract did not provide for the sole personal services of Peaseley. By its terms it included his associates. We hold, therefore, that the contract was not such a personal service contract as would be terminated by Peaseley's death, but that it survived him and could have been carried out by his associates.

The next question which arises is: What, if anything, was Peaseley or his associates required to do under the terms of the contract?

[4]    The heart of a contract is the intention of the parties and is to be ascertained from the language used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time. General custom in the business or trade may be considered in arriving at the intention of the parties, and words of a contract referring to a particular trade will be interpreted by the courts according to their widely accepted trade meaning. *Phillips v. Construction Co.,* 261 N.C. 767, 136 S.E. 2d 48 (1964) ; *McAden v. Craig,* 222 N.C. 497, 24 S.E. 2d 1 (1942) ; *Hughes v. Knott,* 138 N.C. 105, 50 S.E. 586 (1905) ; 2 Strong, N. C. Index 2d, Contracts § 12, p. 315.

The rule is stated in Corbin on Contracts, Ch. 24, § 556, p. 525, as follows:

"Usages and customs may be proved, not only to aid in interpretation of the words of the parties, but also to affect the contractual relations of the parties by adding a provision to the contract that the words of the parties can scarcely be said to have expressed. . . . If proof of usage and custom is permitted to add a provision that is not expressed in words, it is because one of the parties

asserts that they intended that it should be so included; intended it, at least, as much as they intend to include the provisions that they try to express in words. In either case, it is enough if one of them intended it and the other knew or had reason to know that he did so."

As stated by Chief Justice Stacy in *McAden v. Craig, supra,* ". . . (I)t has been held that the general custom in the business or trade may be considered in arriving at the intention of the parties."

The words of the contract "offer and sell" and "to sell this account" refer to the sale of coal by an independent coal broker and will ordinarily be interpreted by the court according to their widely accepted trade meaning. *Phillips v. Construction Co., supra.* Both parties to the contract in question construed it to mean that Peaseley was to "service" the account.

Mr. F. X. Carroll, president of defendant, testified as to the custom of the trade in connection with coal brokers and as to what Peaseley did under the contract:

"In the coal business the functions of an independent coal broker and an internal sales department are interchangeable. In one instance, you use a coal broker and have no sales department. In the other you employ your own salesman and use no brokers. Whether you use your own salesman or a broker, his function is to deal with the customer on a day-to-day basis, handling all of the variables that are written into the contract and dealing with all the problems I have outlined.

"When a wage adjustment, changing conditions in the mines or other factors increase the seller's costs, whoever is selling the coal to the power company must negotiate a new price. When analyses of the coal company and the power company are not in agreement he has to iron out the differences in order to make sure that the price computation on coal to be shipped subsequently will be fair to the shipper. When analyses of the coal run consistently low he has to persuade the power company to accept coal below the contract specifications. When the power company wants more coal than the coal company can ship or the coal company wants to ship more than the power company needs, he has to deal with the power company about this.

"Traditionally, in the coal industry some coal has been sold by independent brokers or manufacturers' representatives who handled all the relationships and dealings with the customers. These brokers may be salesmen buying and selling on their own account or selling for others on a commission basis. On the other hand, some coal companies have salaried employees who handle their dealings with customers. Whoever handles the relationship with the customer has to deal with all the problems I have described.

\* \* \*

"Our 1963 Coal Contract with Mill Power was in no sense a completed sale. It assured Duke of a source of supply and us of a customer, but other than that we still received orders on a month-to-month basis as we had before, we still had the same problems to deal with on a frequent and regular basis, Peaseley still dealt with them and we still paid him ten cents a ton commission on coal shipped as it was shipped. Our contract with Peaseley provided that we would pay him ten cents per ton on all tonnage shipped to Duke 'as long as you are able to place for use by Duke Power' tonnage at at least the stated level. If he had quit working after the execution of the 1963 Coal Contract, the whole relationship with Duke would have promptly ground to a halt if we had not hired someone to take his place doing the job he was doing.

\* \* \*

"Both before and after the 1963 Coal Contract Peaseley routinely did these types of things for us, to wit:

"(a) He pushed more coal to Mill Power than it ordered at certain times;

"(b) At other times, he appeased Mill Power when we were not in a position to ship coal it had ordered;

"(c) Our supply of coal to Mill Power was on two railroads, N & W and Clinchfield. He negotiated changes in the ratio of N & W coal to Clinchfield coal in accordance with our wishes;

"(d) He negotiated specifications; (1) He arranged for the customer to take a product that was below specifications on a daily basis; (2) He negotiated a settlement when

our analyses were not in agreement with those of Duke Power on the same coal. The price we were paid for our coal depended on this."

Plaintiff's evidence showed that Peaseley performed the following duties under the contracts: He received coal orders each month from Mill Power, each month's orders differing from those of the preceding month, stating the type of coal, the number of carloads and where they were to be placed. He then forwarded these orders to defendant. If defendant could not fulfill the orders, he worked out some agreement with Mill Power to revise them. When defendant needed to overship, he arranged for Mill Power to take the excess coal. When floods or other events necessitated rearrangement or curtailment of shipments, he worked this out with Mill Power. When defendant needed to change the mix of the coal it shipped from various sources, he worked this out with Mill Power. If disagreements arose between Mill Power and defendant about the weight or quality of coal shipped, he dealt with Mill Power about it on defendant's behalf. When price adjustments became necessary because of variations in quality of coal delivered, he negotiated these with Mill Power. When a renegotiation of the basic price formula became necessary, he renegotiated this with Mill Power. These things required immediate attention on a daily basis. When he was absent from the office, his secretary, Mrs. Martha Patterson Byrd, performed these duties. Mrs. Byrd testified that after the 1963 coal contract was executed Peaseley constantly worked on this account, so that in the last two or three years of his life handling the account took most of his time. The Mill Power executive with whom Peaseley dealt testified that when something was wrong Mill Power went to Peaseley and he handled it with the coal supplier and corrected it. All of Mill Power's contacts about defendant's coal were with Peaseley. Defendant never dealt with Mill Power without Peaseley.

In the present case both the parties by their actions over a period of several years construed the contracts to mean that Peaseley was to perform those services an independent coal broker usually performed in the sale of coal; that is, to deal with the customer on a day-to-day basis, handling all the problems that arose under the contract for the sale of defendant's coal to Mill Power.

The best evidence of the intention of the parties to a contract is the practical interpretation given to their contracts by the parties while engaged in their performance. As said by Chief Justice Stacy in *Cole v. Fibre Co.*, 200 N.C. 484, 157 S.E. 857 (1931) :

> "The general rule is, that where, from the language employed in a contract, a question of doubtful meaning arises, and it appears that the parties themselves have interpreted their contract, practically or otherwise, the courts will ordinarily follow such interpretation, for it is to be presumed that the parties to a contract know best what was meant by its terms, and are least liable to be mistaken as to its purpose and intent. [Citations omitted.] 'Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it of what was intended by its provisions.' 6 R.C.L. 853.

> "It is often said that 'the construction of a contract, when in writing or agreed upon, is a matter of law for the courts.' *Barkley v. Realty Co.*, 170 N.C. 481, 87 S.E. 219.' This is true, and in 'those written contracts which are sufficiently ambiguous or complex to require construction, the general rule is that the intention of the parties is the polar star. . . . If the words employed are capable of more than one meaning, the meaning to be given is that which it is apparent the parties intended them to have.' *King v. Davis*, 190 N.C. 737, 130 S.E. 707. Frequently, this intention can best be gathered from the practical construction of the contract which the parties themselves have adopted and observed during the period of harmonious operation. [Citation omitted.]

> \* \* \*

> "Finally, we may safely say that in the construction of contracts, which presents some of the most difficult problems known to the law, no court can go far wrong by adopting the *ante litem motam* practical interpretation of the parties, for they are presumed to know best what was meant by the terms used in their engagements. . . ."

See *Bank v. Supply Co.*, 226 N.C. 416, 38 S.E. 2d 503 (1946); 2 Strong, N. C. Index 2d, Contracts § 12, p. 313.

[5] Adopting the interpretation placed upon the contracts by the parties themselves, we hold that under the terms of the contracts Peaseley or his associates were required to perform the services ordinarily performed by a coal broker in handling all the variables written into the contract and dealing with all the problems which arose under it—services which Peaseley satisfactorily performed until his death.

Martha Patterson Byrd, Peaseley's secretary since 1955, testified at length concerning the desire of herself and Mrs. Peaseley, as associates of R. H. Peaseley, to continue to service the 1963 contracts:

"After Mr. Peaseley's death, the first contact I had with any official of Vicco was when Mr. Carroll and his attorney came down to discuss the contract, the commission contract. What they said about continuing to pay commissions under the commission contract was that the contract was invalid and they didn't want to continue. They did not express any willingness to go forward upon any basis whatever.

"As to what I did myself with respect to the flow of coal from Vicco to Duke, after the time of the executing of the Vicco-Duke contract of June 19, 1963, when Mr. Peaseley wasn't in, when he was out of town, I would handle any complaints with Vicco, or if it was necessary to call Vicco about shipping more coal or call Mill Power, or if Mill Power called me with a complaint, I could handle it, the complaint. The specifying of the quantities or orders for coal were sent to Mr. Peaseley's office by Mill Power around the 20th or 25th of each month. I made copies of them in my office and sent them to Virginia Iron, Coal and Coke Company.

"I had contact with Mr. H. D. Waters of Duke Power Company or Mill Power Supply Company with reference to continuing the relation as it had been before."

In an affidavit taken 8 January 1968 Martha Patterson Byrd testified:

"I discussed the Mill Power Supply contract with Mr. Carroll after Mr. Peaseley's death only when Mr. Carroll

came to our office. I called VIC before that. I am not sure whether I talked to Mr. Carroll, but I did talk to someone there on the phone. Several days after Mr. Peaseley's death after Mr. Carroll had already made a trip to Charlotte, but didn't come to see me, I called him. The contract was the subject of discussion. What we discussed was just the fact that we wished to continue representing their company. Mr. Stokes and I together were talking to Mr. Carroll over the telephone. Mr. Stokes was a close friend of Mr. Peaseley's and Mr. Peaseley had asked him to help look after the business in case anything happened to him. He was not otherwise connected with Mr. Peaseley's business and received no money from it.

\*     \*     \*

"Mr. Carroll and Mr. Rogers came to our office. I said a while ago that we wanted to continue the contract when we called him. We did not discuss with him any question about how it would be continued and what, if any, changes would have to be made or any changes in the commission. The conversation was a matter of whether they would allow us to continue representing the company. That was the only thing that we discussed. We didn't discuss it much over the phone. It was discussed in our meeting. All I did over the telephone was tell him or infer that he should have come to my office at the time that he was in Charlotte, because I was the only one left there to handle the business. . . .

\*     \*     \*

"We discussed whether Mrs. Peaseley was an associate, or whether I was an associate or whether Mr. Stokes was an associate. We didn't reach any agreement. There was no discussion about continuation of Mr. Peaseley's business under the name of R. H. Peaseley Assoc. I don't remember discussing that. We told him that the business was to be continued and that I was to carry on the business. I don't know whether I told them we would carry on under the name of R. H. Peaseley and Associates or not, but Mrs. Peaseley and I decided on that name immediately after Mr. Peaseley's death. That name had not been used until after his death."

Mr. Carroll, president of defendant, in an affidavit dated 14 January 1971 discussed the action which his company took to

find someone to carry out the function that Mr. Peaseley had performed related to the 1963 contract prior to his death:

> "Immediately after Peaseley's death, I talked with Mr. Waters at Mill Power about how our contract was to be serviced from then on. He made it clear that it would have to be serviced by someone. He would not suggest anyone, but he asked us to tell him who the person handling the contract would be. I told him that we were thinking about bringing someone into the company to service our accounts, but that I would service his account personally until Peaseley was replaced.
>
> *    *    *
>
> "In November 1965 we hired Harry C. Birkhead as vice president in charge of sales. . . .
>
> *    *    *
>
> "Birkhead became a salaried employee of the company and took over the handling of our relationships with our customers. This was a new position. . . .
>
> *    *    *
>
> "All of our dealings with Mill Power and Duke with respect to these problems have been handled by Mr. Birkhead. If Mr. Peaseley had been alive he would have continued to handle them. This is the function that he was performing up until he died. . . . "

Defendant employed Mr. Birkhead to handle the problems with Mill Power as Peaseley had previously done. Nothing in the record indicates that Mrs. Peaseley and Mrs. Byrd or associates employed by them could not have continued to perform these services. They were not allowed to do so. The employment of Mr. Birkhead precluded further performance by Peaseley's associates even though Mrs. Byrd had tendered such continued performance.

[6]   Defendant's rejection of Mrs. Byrd's offer to perform constituted a breach by defendant of Peaseley's commission contract. ". . . (F)ollowing the consummation of a contract, the plaintiff must show that he offered to perform his part of the agreement, or that such offer was rendered unnecessary by the refusal of the defendant to comply, before an action will lie, either for its breach or for specific performance. . . . " *McAden v. Craig, supra.* See *Seed Co. v. Jennette Bros. Co.,* 195 N.C. 173, 141

S.E. 542 (1928); *Ducker v. Cochrane*, 92 N.C. 597 (1885). In the instant case defendant not only rejected the offer of Peaseley's associates to comply with Peaseley's obligations under the contract but by employing Birkhead and assigning to him the duties formerly performed by Peaseley made further performance by Peaseley's associates impossible.

[7]  The commission contract of 6 September 1960 specifically provided for performance by "Peaseley or his associates." However, as to the compensation to be paid under the contract it stated: "In consideration for the exclusive right to sell this account, you agree to limit your commission to (10¢) ten cents per net ton. This commission will be paid directly to you by separate remittance on tons actually shipped, determined by railroad weights." Clearly, the compensation was to be paid to Peaseley alone. At his death the right to receive these commissions inured to the benefit of his estate, and his executrix was the proper party to bring this action.

[8]  During his lifetime Peaseley paid the expenses of performing his obligations under the contract, and had Peaseley's associates been allowed to continue such performance Peaseley's estate would have been liable for the reasonable expenses incurred by his associates in performing such duties. The amount, then, to be recovered by the plaintiff in this action is the loss of net profits to Peaseley's estate resulting from the wrongful breach of the contract by defendant insofar as they may be determined with reasonable certainty, to the end that the parties may be placed as nearly as possible in the same monetary condition that they would have occupied had the contract not been breached. *Rubber Co. v. Distributors*, 253 N.C. 459, 117 S.E. 2d 479 (1960); 2 Strong, N. C. Index 2d, Contracts § 29, p. 339.

Specifically, the loss of net profits which plaintiff is entitled to recover is ten cents per net ton of coal shipped under the contract of June 1963 from the date of Peaseley's death until the contract was terminated, reduced by such reasonable expenses as would have been incurred by his associates in servicing the contract had they been permitted to do so.

The burden of proof is on plaintiff not only to show the commissions lost as a result of the defendant's breach but also to show the reasonable expenses which Peaseley's associates

would have incurred in servicing the contract. The rule is stated in 22 Am. Jur. 2d, Damages § 296:

> "Where the plaintiff sues for profits lost because of the refusal of the defendant to permit him to complete a contract, he has the burden of proving such profits, including the constituent elements entering into the cost to him of doing the work."

In *Tillis v. Cotton Mills* and *Cotton Mills v. Tillis,* 251 N.C. 359, 111 S.E. 2d 606 (1959), plaintiff, a carrier, brought suit for breach of his shipping contract with defendant. Plaintiff established only the amount which he would have received under the shipping contract. This Court remanded for a new trial because plaintiff did not show the extent this amount would be reduced by the costs of transporting defendant's goods. Justice Clifton L. Moore, speaking for the Court, said:

> " . . . Ordinarily the measure of damages for breach of an executory contract for transporting goods, where the breach prevents plaintiff from hauling the goods, is the revenue plaintiff would have received for the services less the costs and expenses of transporting the goods.

> "If any of the factors involved in revenue and costs are estimated, the estimates must be based on facts. *Goforth v. Smith* (Okla. 1952), 244 P. 2d 304. A witness will not be permitted to give a mere guess or opinion, unsupported by facts, as to the amount of damages arising upon a breach of contract. The amount of damages is the ultimate issue to be determined by the jury. It is incumbent upon the plaintiff to present facts, as to all reasonable factors involved, that the jury may have a basis for determining damages. [Citations omitted.]"

See also *Haddad v. Western Contracting Co.,* 76 F. Supp. 987 (D.C.W.Va. 1948); *Whiting v. Dodd,* 39 Ala. App. 80, 94 So. 2d 411 (1957); *Clarkson v. Crawford,* 285 Pa. 299, 132 A. 350 (1926).

For the reasons stated, the decision of the Court of Appeals affirming the judgment of the Superior Court of Mecklenburg County adjudging defendant liable to Peaseley's estate for commissions on coal shipped after Peaseley's death and prior to the termination of the contract of June 1963 is affirmed. The decision of the Court of Appeals affirming the judgment of the

Superior Court of Mecklenburg County on the issue of damages is reversed, and this case is remanded to the Court of Appeals for the entry by it of a judgment reversing the decision of the Superior Court on the issue of damages and remanding the case to that court for its determination of damages in accordance with this opinion.

MODIFIED AND REMANDED.

Justice HIGGINS dissenting.

The pertinent facts in this case are clearly and succinctly stated in the Court's opinion. However, I am unable to agree with certain of the legal conclusions which the Court draws from the facts in evidence. Particularly I disagree with the conclusion that the words "or associates" in the contract give to the administratrix of Mr. Peaseley's estate the legal right to collect for the estate the commissions for sales made and commissions earned after his death.

The record discloses the manifold duties under the contract Mr. Peaseley was obligated to perform in return for a commission of ten cents per ton on all coal delivered by rail from the defendant's mines in West Virginia to the storage bins of the Duke Power Company in Charlotte, North Carolina, for use in the production of electric current. The sales agreement provided that the coal should meet certain tests and specifications as to quality and characteristics, including the moisture content, the ash and sulphur content, the size, softening temperature, and grindability. Deliveries were required at the proper time and in the quantity and quality called for by the purchaser. These requirements demanded the constant attention of the sales broker.

It is to be expected that a contract involving nearly a million tons annually would of necessity generate certain differences between the producer, the transporter, and the consumer. Settling of these differences was the function of Mr. Peaseley. He was an expert in the field. For the year preceding his death he negotiated sales and deliveries of more than 900,000 tons of coal. Did he have "associates" in the operation who were entitled to continue the contract in his name, render the services which he had contracted to render, and as associates are entitled to carry on his contract?

After the oral contract was negotiated, the coal company reduced it to writing and forwarded it to Mr. Peaseley at Charlotte for his approval. The contract provided that for his services in negotiating the sales and in performing the manifold duties involved in the deliveries of coal in the quantity and quality and at the intervals required by the purchaser, he was to receive ten cents per ton. After receiving the written memorandum of the contract, he returned it to the coal company and asked that the words "or associates" be inserted in the contract after his name. The Court says these words "or associates" exempt this contract from the general rule that a contract for personal services terminates at the death of the promissor. "Associates" in a business contract certainly carry the implication that they are in a position to perform the essential obligations required of the named party. "Associates" in a business undertaking mean something more than associates at the bridge table, the cocktail lounge, or the golf course. The added words "or associates" certainly do not imply that Mr. Peaseley had associates in the business at the time. Otherwise, the contract should have said "*and* associates" and it would have been easy to name them.

There is no evidence in the record that after the contract was entered into, Mr. Peaseley ever selected or included any associates in the operation of the sales agreement. All of the evidence is to the contrary. The evidence discloses that Mr. Peaseley's office force consisted of Mrs. Martha Byrd, his secretary-bookkeeper, and himself. Mrs. Byrd was employed in 1955 and continued to work in the office in the same capacity thereafter. The evidence does not disclose any change in her status. True, she handled many of the details when Mr. Peaseley was absent and continued to do so as she became familiar with the procedures. She has made no claim of her ability, or of the ability of anyone else, to service the contract in such manner as Mr. Peaseley had been able to do. She testified as a witness in this case: " . . . I was asked, if during the years 1956 and up until the time of Mr. Peaseley's death in 1965, whether anybody else assisted him in handling this Mill Power account . . . other than myself. I answered 'no', and that is correct."

The evidence further disclosed that Mr. Peaseley had a business telephone in his home and when he was away from Charlotte, Mrs. Peaseley answered the telephone and gave such information as to Mr. Peaseley's whereabouts or the business as she was able to furnish. So that the record discloses that

never at any time did any person participate in the business other than Mrs. Byrd and Mrs. Peaseley, and they only to the extent here disclosed. It is a fair question to ask, this being so, why did Mr. Peaseley ask for the insertion of the words "or associates"? I think the record suggests the answer.

Prior to the Second World War, Mr. Peaseley and Mr. Charles J. Stokes operated an incorporated business together. It was not very successful. However, after the war, Mr. Stokes returned, entered business, and occupied an office near Mr. Peaseley in the Johnston Building. Mr. Stokes testified: "During this time I was always in contact with Bob, and, of course, we were always friends. . . . Very close friends. . . . He was my best friend. I would say that I saw him daily during the week. . . . From time to time he showed me his monthly shipments . . . " Mr. Peaseley could well have had in mind an invitation to his former partner, Mr. Stokes, to join him in his contract with the defendant. Mr. Peaseley was able to show that a place with a handsome salary was ready for him. The words "or associates" provided Mr. Peaseley with the right to select associates if he so desired.

As further proof that there were no associates, the record discloses that only Mrs. Byrd and Mrs. Peaseley had any connection whatever with the operation and they make no claim to any rights under the contract. Mrs. Byrd testified as a witness. Mrs. Peaseley brought the suit and claimed that all commissions were earned by her husband and belonged to his estate. There were no associates at the time the contract was entered into; none has joined thereafter; none was present before the court asserting a claim to commissions. "Associates" were straw men or women. There is no need to go through the motion of knocking them down because they have never stood up. Any "associates" entitled to share with Mr. Peaseley in the obligations and in the benefits of this business necessarily would be his partners or his agents. If partners, the survivors would be required by law, G.S. 59-51, etc. to dissolve and to account. If as agents, the agency would necessarily terminate at the death of the principal.

In this case there is no allegation, no admission, and no finding by the Court that any associate of Mr. Peaseley rendered any service to the Virginia Iron, Coal and Coke Company in connection with the sale and delivery of coal to Duke Power Company after Mr. Peaseley's death. The coal company made

no move or acknowledgment that it consented to the continuation by any other person of the work Mr. Peaseley was obligated to do for the company under the contract. Everything indicates the coal company was paying, and well, for Mr. Peaseley's personal services and his know-how.

A contract for personal services of the type required of Mr. Peaseley is not assignable and does not survive his death. Of course, death makes performance impossible. Justice Ruffin many years ago stated the rule which successive cases have followed: "[W]here one party covenanted to serve another . . . the death of either party dissolved the contract—such being an implied condition, it was said, in every contract for personal services. . . ." *Siler v. Gray*, 86 N.C. 566.

The decision of the Court does two things: (1) It continues in effect after death a contract for Mr. Peaseley's highly personal services; and (2) it requires the Virginia Iron, Coal and Coke Company to donate hundreds of thousands of dollars to the Peaseley estate. The Court thinks these results were within the contemplation of the parties when they entered into the contract of September 6, 1960. I am compelled to disagree and dissent. I vote to reverse the decision of the Court of Appeals and remand the case to the superior court with directions to dismiss the action.

Justice LAKE joins in this dissenting opinion.