PAUL W. HOUSER v. GEORGIA LIFE & HEALTH INSURANCE COMPANY, INC.

No. 7426SC456

(Filed 17 July 1974)

Contracts § 12; Insurance § 2— employment contract — payment of commission — construction

Provision of an employment contract between plaintiff and defendant hiring plaintiff as state manager in charge of recruiting agents should be construed to mean that when plaintiff's loss ratio rose above 50%, his commissions should be reduced by an amount equal to 5% of the commissions, not 5% of the premiums, since such construction was supported by examination of the contract as a whole and was consistent with the purpose of the provision.

APPEAL by defendant from *Godwin, Special Judge,* 7 January 1974 Session of Superior Court held in MECKLENBURG County.

This is an action to recover commissions allegedly owed to plaintiff under a contract with defendant insurance company.

The parties stipulated to the facts. On or about 24 September, 1965 plaintiff and defendant entered into a written contract. The contract included three documents entitled "General Agent's Agreement," "Commission Schedule" and "State Manager Addendum." The "General Agent's Agreement" contained twenty-three articles. Article I provided that plaintiff was to act as an agent for defendant for the purpose of selling insurance policies. Article XIV provided:

"In consideration of the services performed hereunder by the General Agent and his Sub-Agents, the General Agent shall be entitled to commissions provided for in the 'Schedule of Commissions,' Exhibit 1, which is attached and made a part of this agreement."

Article XVII provided:

"This contract may be terminated at the absolute discretion of either party hereto by the mailing of a written notice to the other party at least thirty (30) days before said termination shall become effective. . . .

"If this Agreement is terminated by the Company or the General Agent or by the death or total disability of the General Agent, the Company will pay to the General Agent or to his estate, as the case may require, renewal commissions as provided in the Schedule of Commissions with 20% of these renewal commissions being deducted as a service charge. . . ."

The "Commission Schedule" provided as follows:

"EXHIBIT I

*Commission Schedule*

Hospitalization Policies including all Guaranteed Renewable Policies and the Cancer Policy. (If other Policies are from time to time made available to the General Agent for sale, rates of commission thereon will be provided on additional exhibits hereto.)

The following commissions to the General Agent will apply:

*First Year Commissions*
*Monthly Policies*

General Agent's commission is 100% of the first three months—50% of the balance of the first year.

*Quarterly Policies*

General Agent's commission is 100% of the initial quarterly payment—50% of the balance of the first year.

. . . .

Starting with the Second Year premium payments, the General Agent will receive 30%. In addition, the General Agent will retain 100% of any policy fee where applicable.

In the event the loss ratio on the business produced by the General Agent exceeds 50% on the basis of incurred losses to earned premiums, the commission scale will be reduced by 5% on both new and renewal business. Such reductions shall remain in effect until the aggregate loss ratio attains a figure of 50% or less."

Although plaintiff and defendant signed a "General Agent's Agreement," it was not intended that plaintiff should be an ordinary insurance agent, selling insurance policies to individual customers. Instead, he was to serve as defendant's "state manager" for North Carolina. In this position, he was in charge of recruiting and training new agents for defendant. The "State Manager Addendum" signed by the parties provided (emphasis in original):

"GEORGIA LIFE AND HEALTH INSURANCE COMPANY is hereby appointing PAUL W. HOUSER as State Manager for the STATE OF NORTH CAROLINA for the purpose of recruiting and training General Agents and Agents for the Company.

"The *compensation* to be received for these efforts *will be derived* from the contract that this Addendum is made a part of and attached hereto. . . .

"It is also understood and agreed that the State Manager will devote his full time and efforts in the development of General Agents and Agents for Georgia Life and Health Insurance Company."

Plaintiff served as state manager for defendant from 1 October 1965 until 31 March 1968, and he recruited a number of agents for defendant. His compensation as state manager was based on the difference between his own contract with defendant and the contracts of the agents whom he recruited. Each agent recruited by plaintiff signed a "General Agent's Agreement" which was substantially similar to the one signed by plaintiff. Attached to the "General Agent's Agreement" was a "Commission Schedule" providing as follows:

"Commission Schedule

Hospitalization Policies including all Guaranteed Renewable Policies and the Cancer Policy. (If other Policies are from time to time made available to the General Agent for sale, rates of commission thereon will be provided on additional exhibits hereto.)

The following commissions to the General Agents will apply:

*First Year Commission*
*Monthly Policies*

General Agent's commission is 100% of the first three (3) months—35% of the balance of the first year.

*Quarterly Policies*

General Agent's commission is 100% of the initial quarterly payment—35% of the balance of the first year.

.   .   .   .

Starting with the Second Year premium payments, the General Agent will receive 25%. In addition, the General Agent will retain 100% of any policy fee where applicable.

In the event the loss ratio on the business produced by the General Agent exceeds 50% on the basis of incurred losses to earned premiums, the commission scale will be reduced by 5% on both new and renewal business. Such

reductions shall remain in effect until the aggregate loss ratio attains a figure of 50% or less."

When an agent recruited by plaintiff sold an insurance policy, and the policy was renewed for a second or subsequent year, the agent selling the policy received a commission equal to 25% of the premium paid, and plaintiff received a commission of 5%. (It should be noted that the only commissions at issue in this lawsuit are renewal commissions. There is no dispute as to the amount of first-year commissions owed to plaintiff.) Since plaintiff received a commission on each insurance policy sold by an agent he had recruited, he was encouraged to recruit as many agents as possible, and to recruit agents who would work diligently and sell large amounts of insurance.

Defendant paid plaintiff commissions at a rate of 5% until 31 March 1968. On that date defendant dismissed plaintiff from his employment as state manager and general agent. Thereafter, defendant paid plaintiff commissions at a rate of 4%.

In November 1969 the loss ratio on business produced by plaintiff reached a level in excess of 50%, and defendant stopped paying commissions to plaintiff. Since November 1969 the loss ratio has remained above 50%, and plaintiff has received no further commissions.

Plaintiff brought this action in the Superior Court of Mecklenburg County, alleging that he was entitled to receive commissions at a rate of 3.8% for the period from November 1969 through December 1972. Defendant denied that plaintiff was entitled to any commissions for this period. The Superior Court gave judgment for plaintiff, and defendant appealed.

*Thomas D. Windsor for plaintiff appellee.*

*Jones, Hewson & Woolard, by Harry C. Hewson, for defendant appellant.*

BALEY, Judge.

In this case it is necessary to interpret the provision of plaintiff's "Commission Schedule" which reads as follows:

"In the event the loss ratio on the business produced by the General Agent exceeds 50% on the basis of incurred losses to earned premiums, the commission scale will be reduced by 5% on both new and renewal business."

Plaintiff's loss ratio rose to a level above 50% in November 1969. Until that month, he had been receiving commissions from defendant at a rate of 4% of renewal premiums. Plaintiff contends that under this provision of the contract, defendant should have deducted from his commissions an amount equal to 5% *of the commissions*. In other words, his commissions should have been reduced by 5% of 4%—that is, by 0.2%—and defendant should have continued to pay him commissions at a rate of 3.8%.

Defendant contends that when plaintiff's loss ratio rose above 50%, his commissions were to be reduced by an amount equal to 5% *of the premiums*, not 5% of the commissions. Since plaintiff had been receiving commissions at a rate of 4% of the premiums, a deduction of 5% of the premiums would leave him with no commissions at all. Accordingly, defendant paid plaintiff no commissions after November 1969.

We hold that the correct interpretation of the contract is the interpretation proposed by plaintiff.

First, plaintiff's interpretation is supported by an examination of the contract as a whole. There are two penalty provisions in the contract between plaintiff and defendant. One of these is the provision quoted above, requiring a 5% reduction in commissions when plaintiff's loss ratio exceeds 50%. The other penalty provision is found in Article XVII of the "General Agent's Agreement." Article XVII provides that whenever the contract between the plaintiff and defendant is terminated by either party, plaintiff's commissions are to be reduced by 20%. In March 1968, when defendant dismissed plaintiff from his positions as state manager and general agent, this provision was put into operation. Prior to March 1968, plaintiff had been receiving commissions at a rate of 5% of renewal premiums. After March 1968, defendant continued to pay commissions to plaintiff, but at a rate of 4% rather than 5%. In other words, plaintiff's commissions were reduced by an amount equal to 20% *of the commissions*, not 20% of the premiums. This is the interpretation placed on one penalty provision of the contract by the defendant insurance company and accepted by the plaintiff. The parties having adopted this interpretation, the other penalty provision of the contract should be construed in the same way; it, too, should call for a reduction in plaintiff's compensation to be measured by a percentage of his commissions. *Preyer v. Parker*, 257 N.C. 440, 125 S.E. 2d 916; *Construction*

*Co. v. Crain and Denbo, Inc.,* 256 N.C. 110, 123 S.E. 2d 590; 3 Corbin, Contracts, § 558. A contract should be interpreted as a whole, and similar provisions of the contract should be given similar effects. *Yates v. Brown,* 275 N.C. 634, 170 S.E. 2d 477; 3 Corbin, *supra,* § 549; *cf. Trust Co. v. Bass,* 265 N.C. 218, 143 S.E. 2d 689.

Second, plaintiff's proposed construction of the 5% penalty provision is consistent with the purpose of the provision. Defendant was interested in keeping its loss ratio as low as possible, and thus increasing its profits. To encourage its agents to sell insurance to persons in good health, defendant inserted into its agents' contracts a provision calling for a reduction in commissions if the agent's loss ratio rose above 50%. But plaintiff did not sell any insurance policies for defendant; it was the local agents whom plaintiff recruited and trained that sold insurance policies to individual policyholders. It does not seem reasonable that the parties contemplated that the state manager be deprived of all his commissions because local agents sold policies to poor insurance risks. A contract should be interpreted in accordance with its purpose. *Peaseley v. Coke Co.,* 282 N.C. 585, 194 S.E. 2d 133; *Bank v. Corbett,* 271 N.C. 444, 156 S.E. 2d 835; *Starling v. Taylor,* 1 N.C. App. 287, 161 S.E. 2d 204; 3 Corbin, *supra,* § 545.

The judgment of the Superior Court is

Affirmed.

Judges BRITT and MORRIS concur.